**AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE et al., Plaintiffs,**

v.

**Henry A. BUBB, Chairman, State Education Commission, et al., Defendants,**

**Patrick J. Audley, Intervenor.**

**Civ. A. No. W-5351.**

United States District Court,
D. Kansas.

Feb. 27, 1974.

Jim Lawing, Wichita, Kan., Walter C. Wright, Silver Springs, Md., for Americans United etc. only.

Vern Miller, Atty. Gen., John C. Johnson, Asst. Atty. Gen., Topeka, Kan., for defendants.

Gerrit H. Wormhoudt and Donald R. Newkirk, Wichita, Kan., for intervenor.

Before HILL, Circuit Judge, BROWN, Chief District Judge, and THEIS, District Judge.

HILL, Circuit Judge.

OPINION

Kansas' Tuition Grants for Private Institutions, K.S.A. 72–6107 et seq. (Statute), provides tuition grants to qualified students enrolled at private Kansas colleges and universities (Colleges). This case arises from the fact that all eligible private Kansas colleges are church related. Plaintiffs, pursuant to 28 U.S.C. § 2201 and Rules 57 and 65, F.R.Civ.P., seek a declaration that the Statute violates the establishment and free exercise clauses of the First Amendment to the United States Constitution and that the Statute violates the equal protection clause of the Fourteenth Amendment.

Plaintiffs are citizens, residents and taxpayers of the State of Kansas. The defendants include the state controller, the head of the administrative office of the State Education Commission, and the members of the State Education Commission. The defendant-intervenor, a student at Southwestern College currently receiving a state tuition grant, was permitted to intervene pursuant to Rule 24(b)(2), F.R.Civ.P. Jurisdiction is based on 28 U.S.C. § 1343(3), and since the complaint seeks to enjoin a state law as repugnant to the Constitution, this three-judge court has been convened pursuant to 28 U.S.C. §§ 2281, 2284.

Plaintiffs first allege they have been denied equal protection of the laws; that is, only those students choosing an independent college for their higher education are eligible to receive tuition grants under the Statute. The Statute therefore constitutes impermissible class legislation which violates the Fourteenth Amendment's equal protection clause. Their second argument is the Statute violates the establishment and free exercise clauses of the First Amendment. The establishment clause is violated because the tuition grants subsidize and advance the mission of the religious institutions. The free exercise clause is violated because the State requires plaintiffs as taxpayers to financially aid religious institutions, thereby denying them the right to freely exercise their individual beliefs.

Defendants deny there has been any equal protection violation. They assert there is no state attempt to divide the college population into two classes and

then grant benefits to one class which are withheld from the other. They also suggest that plaintiffs have no standing to argue the equal protection clause since they lack any personal stake in the outcome; neither the plaintiff organization nor any of the individual plaintiffs are college students. Defendants also deny the First Amendment violations, arguing that any connection between the churches and Colleges is formalistic. They assert the Colleges are essentially secular with curriculums quite similar to those found in state institutions. Their position is the Colleges receive minimal financial aid from the churches, do not proselytize nor indoctrinate; and allow students of all races, religions and creeds to enroll. Thus any church connection with the Colleges is minimal.

The case is now before us for final decision on the merits of the constitutional claims. We have held a hearing at which time we received depositions and documentary evidence, together with certain stipulations entered into by the parties. On the basis of this record, we make the following findings of fact and reach the following conclusions of law in compliance with Rule 52(a), F.R.Civ.P.

## I. FINDINGS OF FACT

### A. The Statutory Scheme.

The Statute authorizes tuition grants to any qualified student enrolled at an accredited independent institution.[1] A student may not receive the tuition grants for more than eight semesters of undergraduate study or the equivalent thereof. Such grants to a student are limited in any year to the lesser of the total tuition and required fees of that student for two semesters, or one thousand dollars. To be eligible the student must demonstrate financial need; that is, he must show a difference between his available financial resources and his anticipated expenses in attending an accredited independent institution. Each student must contribute at least four hundred and fifty dollars each year from his own work and resources, and if reasonably possible his parents must also contribute to his education.

Tuition grants are paid at the beginning of each semester or other term upon certification by the accredited independent institution that the student is enrolled and is a qualified student. Payment is made upon an approved voucher and the warrant is issued to the student; the warrant, however, is delivered to the accredited independent institution in which the student is enrolled.

To apply for a tuition grant the applicant must file an application for a tuition grant; be responsible for the submission of his parents' confidential statement to the commission and to the institution of higher learning at which he is enrolling; report promptly to the commission any information requested relating to administration of the act; and file annually a new application and parents' confidential statement for determining his eligibility for a tuition grant.

To receive a tuition grant the student must be a resident of Kansas who is enrolled at an accredited independent institution in a course of study covering at least twelve hours each semester. The college he attends must be an accredited independent institution of higher learning located in Kansas which (1) is operated independently and not controlled or administered by any state agency or any subdivision of the state, (2) allows enrollment for any student who merits its academic and other reasonable enrollment requirements without regard for race, sex, religion, creed or national origin, and (3) is accredited by the North Central Association of Colleges and Secondary Schools.

The Statute is administered by the State Education Commission. The Commission adopts rules and regulations for determining financial need; determines who is an in-state student; approves

---

1. See Appendix "A" for pertinent sections of Statute in question.

and awards tuition grants; determines which institutions of higher learning qualify as accredited independent institutions; evaluates the tuition grant program for each period and makes an annual report to the governor and legislature. The Commission's authority includes requiring accredited independent institutions to promptly furnish information which the Commission requests relating to administration or effect of the Statute.

B. Nature of the Crises Leading to the Statute.

Independent colleges in Kansas, like independent colleges throughout the nation, are facing a financial crisis. Inflation, unprecedented growth in faculty salaries and operation costs, and the "knowledge explosion" have required more sophisticated and expensive equipment and libraries. In fact, the cost of educating a college student has increased an average of 7.5 percent annually. The costs have increased so drastically that in the last five year period the average tuition increase among Kansas private colleges was 67 percent. Because tuitions at independent colleges take care of 65 to 90 percent of the institutional costs, it is the student who must pay for the cost spiral. Although state institutions are also faced with rising costs, the tuitions have been kept at a relatively low level by asking the state treasury to pick up a larger bill for each student each year. Approximately 70 to 75 percent of the instructional costs for each state university student, or about $1,150 per student per year, are now paid by the taxpayer.

As the costs at private colleges in Kansas have increased, the enrollment has declined. In 1965 the Kansas independent colleges were educating 17.5 percent of the total Kansas college student population; in 1970 they enrolled about 12 percent. This left the private colleges with faculties, libraries and laboratories for 5,700 more students than they enrolled, and an income loss from tuition alone of $4.5 million. The result is that most independent colleges are operating in the red, with deficits exceeding $1 million. The financial situation has become so tenuous that one College president lamented: "We are so dependent upon tuition for 75 percent of our operating expenses that if 40 fewer students come in September than we expect, we could have a budgeting deficit of $50,000 or more."

Understandably, the Kansas legislature was and is concerned about the financial crisis facing independent colleges. As tuition costs at private colleges mushroom the number of students enrolling in tax supported institutions multiply. The result is that tax supported institutions are forced to campaign for more state funds and more facilities and staff to handle the rising tide of students. Economically speaking, the state will save money by subsidizing private colleges. Presently the state pays over $1,150 per year per student enrolled at a tax supported institution. Even with the tuition grant program, only about half of the Kansas residents enrolled in private colleges are eligible for a tuition grant. Thus with 3,500 students receiving the tuition grants, with the average grant being $800, the cost to the state is still $1,225,000 a year less than if those same students attended state institutions. The state has also saved the cost of educating the other half of the students attending independent colleges plus the expense of adding facilities to handle the influx of students who would have enrolled at a state institution if the grants were not available.

The Governor of Kansas, in a letter to an opponent of the tuition grant program, explained the purposes served by such a program: (1) to assist Kansas students to attend the independent college of their choice; and (2) to indirectly give financial aid to the state's independent colleges and in this way assist them in remaining open and meeting the rising costs of maintaining institutions of higher learning.

Plaintiffs do not challenge the state's reasons for enacting the statute but argue the Statute's effect is to deprive them of their First and Fourteenth Amendment protections. Thus we must scrutinize the operation of the independent colleges separately to determine whether state aid under this statute does in fact violate plaintiffs' constitutional guarantees.

C. Purpose and Operation of the Independent Colleges.

There are nineteen independent colleges at which the tuition grants may be used. They are all liberal arts colleges and to a degree related to the church. They include a Baptist college; one Brethren; six Catholic; two Lutheran; three Mennonite; three Methodist; two Presbyterian; and one Quaker.[2] All are incorporated under the state laws of Kansas and it is apparent that in most instances some denominational control over the Colleges is assured by the corporation's charter which requires a majority of the corporate members to be members of the affiliating church. In many instances the charter also provides for denominational ownership of the College's assets.

The reasons for establishing the Colleges are often stated in the charters; many times one of the primary reasons is to promote in a broad sense Christian education. For example, the amended charter of Kansas Wesleyan states:

This corporation was organized originally and shall continue to exist, not for profit but for the purposes of encouraging and promoting the cause of Christian education generally and to extend the influence of science, art, and Christian culture. . . .

Amended charter of Friends University:

. . . the purposes for which it is formed are: (a) to maintain an institution which shall give instruction in the various departments of arts, sciences, and literature, in the Bible and in such other field of learning or of human endeavor as the Board of Trustees shall designate; (b) to provide that this instruction shall be given by such men and women and under such conditions that the Christian life

| 2.<br>College | Religious<br>Affiliation | Location |
|---|---|---|
| Baker University | Methodist | Baldwin City |
| Benedictine College | Catholic | Atchison |
| Bethany College | Lutheran | Lindsborg |
| Bethel College | Mennonite | North Newton |
| College of Emporia | Presbyterian | Emporia |
| Donnelly College | Catholic | Kansas City |
| Friends University | Quaker | Wichita |
| Hesston College | Mennonite | Hesston |
| Kansas Newman College | Catholic | Wichita |
| Kansas Wesleyan | Methodist | Salina |
| Marymount College | Catholic | Salina |
| McPherson College | Brethren | McPherson |
| Ottawa University | Baptist | Ottawa |
| St. John's College | Lutheran | Winfield |
| St. Mary College | Catholic | Leavenworth |
| St. Mary of the Plains<br>College | Catholic | Dodge City |
| Southwestern College | Methodist | Winfield |
| Sterling College | Presbyterian | Sterling |
| Tabor College | Mennonite | Hillsboro |

of the student shall be encouraged and developed. . . .

Amended by-laws of Donnelly College:

Donnelly College is dedicated to the liberal education of man for his temporal and eternal well-being through the cultivation of the intellectual, religious and moral values consistent with the Catholic Faith and the Judaeo-Christian culture.

The Colleges' reason for existence is also found in their catalogs; a few examples of which are stated below:

To attract students of diversified ethnic, social, and religious backgrounds who possess the ability, character, interest, and will to develop their potentials in an institution dedicated to Christian higher education.

To provide an environment of free and honest inquiry which will intensify the student's sense of confrontation with truth, both as it is discovered by man's probings and as it is revealed in the Holy Bible.

To teach the student the essentials of the Christian heritage, helping him to develop the self-discipline needed to translate personal faith in Christ as Savior into discipleship under Christ our Lord.

The college endeavors to help the student to view all aspects of his program from the perspective of Christian faith and concern. We believe this is possible through persons transformed by an experience of God in the living Christ which we seek to realize in the college community. In adapting its program to the individual student, the college strives to help him . . . to develop a genuine Christian philosophy of life.

To make the campus a place where the members of the college community can recognize and acknowledge the presence and reality of God in the many dimensions of their day and to encourage the person's response to this reality.

Although the Colleges are church-related, the financial support given them by their affiliating church is small; usually no more than five percent of the total college budget.[3] The Catholic church provides practically no monetary support to its church related institu-

| 3. College | Percentage of total college budget supported by denominational funds | | |
| --- | --- | --- | --- |
| | 1970–71 | 1971–72 | 1972–73 |
| Baker University | 5.7 | 4.3 | 4.5 |
| Benedictine College | 0.0 | 0.0 | 0.0 |
| Bethany College | 5.8 | 5.5 | 5.5 |
| Bethel College | 10.9 | 11.2 | 14.7 |
| College of Emporia | 3.6 | 3.4 | 3.7 |
| Donnelly College | 0.0 | 0.0 | 0.0 |
| Friends University | 1.6 | 1.5 | 1.2 |
| Hesston College | 4.0 | 3.6 | 4.3 |
| Kansas Newman College | 0.0 | 0.0 | 0.0 |
| Kansas Wesleyan | 3.7 | 4.9 | 5.3 |
| Marymount College | Less than 1% for all years | | |
| McPherson College | 2.4 | 3.5 | 3.4 |
| Ottawa University | 6.9 | 6.8 | 7.0 |
| St. John's College | 50.9 | 44.7 | 44.7 |
| St. Mary College | 0.0 | 0.0 | 0.0 |
| St. Mary of the Plains College | 0.0 | 0.0 | 0.0 |
| Southwestern College | 5.0 | 4.4 | 4.3 |
| Sterling College | 3.2 | 2.5 | 1.7 |
| Tabor College | 5.6 | 4.2 | 4.6 |

tions, but the religious orders do provide a substantial number of teachers at the Catholic Colleges which in effect is indirect financial support. With this financial support goes denominational influence, usually through denominational boards of higher education. Although these denominational boards ordinarily do not directly establish policies for individual institutions, they often are called upon to give advice and counsel on policy matters.[4] Because these boards are the official agencies of the various churches, they sometimes wield power disproportionate to the financial support given the Colleges by their respective churches.[5] There has been no evidence presented, however, showing these boards of higher education to have dictated any policies which in effect discriminate against non Christians or cause the Colleges to serve as propagandists for their respective faiths.

Church boards of higher education are not the only contacts the Colleges have with their respective churches. Because the charters require a majority of the corporate members to be members of the related church, no doubt corporate members usually elect as directors and trustees of the Colleges men and women who are also members of the sponsoring church. Other religious spheres of influence are the church conferences and conventions and the local church groups within the College area.

Although the Colleges have a religious connection, the facts do not show the institutions to be instruments of the church for purposes of indoctrination or proselytizing. On the contrary, the evidence shows all of the Colleges to be highly respected academic institutions of higher learning that provide an education to students which is on a par with any state supported institution. All institutions subscribe to the 1940 Statement of Principles on Academic Freedom and Tenure endorsed by the American Association of University Professors and by the Association of American Colleges. All of the Colleges are also accredited by the North Central Association of Colleges and Secondary Schools. To be accredited by this association a college must show that it requires a program of general education to enable the student to become acquainted with the major areas of knowledge—the biological sciences, the humanities, the physical sciences, and the social sciences. The faculty members must be given the opportunity to present the truth as they see it so that the students are free to learn and investigate without restriction.

In relation to faculty members, no College requires religious affiliation as a prerequisite for obtaining a teaching position with the College.[6] In most instances a majority of the faculty members have the same religious affiliation

---

4. Church-Related Boards Responsible for Higher Education, U. S. Dept. of Health, Education & Welfare (Bulletin No. 13,1964).

5. Id. For example, the University Senate of the Methodist Church may investigate any and all aspects of the operation of a related institution, including the institution's objectives, academic program, educational standards, personnel, public relations, student personnel services, religious life, church relations, and so forth. Failure of the institution to comply with the recommendations of the Senate may render the institutions ineligible for support by the Division of Higher Education, the Board of Education, or Annual Conference jurisdictions. Another example is the American Baptist Board of Ed-

ucation and Publication. It has developed a "Statement of Relationship for Baptist-Related Colleges" which an institution must adopt as a qualification for affiliating with and being eligible for the services and support of the Board and the denomination. This "Statement" requires, among other things, that the Board of Trustees of the college cooperate with the Board of Education of the American Baptist Convention in developing a philosophy of Christian Higher Education and providing a program of religious life and training on campus.

6. Sterling College's charter requires faculty members to be Christians, but in fact this is not enforced.

as the College where they teach, but there has been no evidence this fact is a result of ecclesiastical direction.[7]

The Statute requires all accredited colleges to allow enrollment for any student who meets its academic and other reasonable enrollment requirements without regard for race, sex, religion, creed or national origin. With the exception of St. John's College, which gives preference on enrollments to applicants from congregations of the Lutheran Church-Missouri Synod, all Colleges allow students to enroll without regard for race, sex, religion, creed or national origin. In regard to religious affiliation, it is apparent that often the student is affiliated with the same church as the school he is attending, but there has been no evidence that this is the result of religious discrimination.[8] On the contrary, the evidence indicates unequiv-

### 7. Faculty Religious Affiliations (Number)

| College | Meth | Presb | Cath | Bapt | Quaker | Luth | Menn | Breth | Agnostic | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| Baker | | | | No records exist | | | | | | |
| Benedictine | 4 | 4 | 61 | | | 3 | | | | 10 |
| Bethany | 7 | | 2 | 1 | | 22 | 1 | | 2 | 5 |
| Bethel | 3 | 1 | 1 | 3 | | | 43 | | | 1 |
| Col. Emporia | 10 | 12 | 4 | 3 | 1 | | | 1 | | 13 |
| Donnelly | 2 | | 32 | | | 1 | | | | 1 |
| Friends | | | | No records exist | | | | | | |
| Hesston | 2 | | 2 | | | | 43 | | | 1 |
| Ks. Newman | 4 | 2 | 29 | 1 | 2 | 2 | | | | 4 * |
| Ks. Wesleyan | 10 | 2 | 3 | 3 | 1 | 2 | 3 | 1 | | 5 |
| Marymount | 3 | | 38 | 1 | | 5 | | | | 10 * |
| McPherson | 5 | 2 | | 1 | | 1 | 1 | 17 | | 5 |
| Ottawa | 4 | 6 | 5 | 27 | | 2 | | | 7 | 11 |
| St. John's | 2 | | | | | 30 | | | | 2 |
| St. Mary | | | | No records exist | | | | | | |
| St. Mary Pl. | 1 | 3 | 31 | 1 | | | | | | 5 |
| Southwestern | 19 | 4 | 5 | 2 | 1 | 1 | 1 | 1 | 5 | 5 * |
| Sterling | 7 | 25 | | 3 | | 3 | 1 | 3 | | 3 |
| Tabor | | 3 | 1 | 6 | | | 38 | | | 5 |

\* Includes persons of other faiths—Jews, Moslems, etc.

### 8. Student religious affiliation (%), Fall 1972–73

| College | Meth | Presb | Cath | Bapt | Quaker | Luth | Menn | Breth | Agnostic | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| Baker | 42.7 | 11.0 | 12.3 | 6.0 | | 3.0 | | | | 25.0 |
| Benedictine | 1.3 | 0.6 | 80.2 | 1.2 | | 0.5 | | | | 17.0 |
| Bethany | 13.8 | 4.3 | 7.0 | 5.0 | 0.1 | 47.8 | 0.7 | 0.7 | | 20.6 |
| Bethel | 5.4 | 0.7 | 2.6 | 4.0 | 0.4 | 0.4 | 58.5 | | | 28.0 |
| Col. Emporia | 9.5 | 9.4 | 28.0 | 5.8 | 0.6 | 1.7 | | | | 45.0 |
| Donnelly | | | | Unidentified | | | | | | |
| Friends | 16.0 | 5.0 | 7.0 | 16.0 | 8.0 | 3.0 | 3.0 | 1.0 | | 41.0 |
| Hesston | 3.3 | 0.9 | 0.7 | 0.4 | | 0.7 | 88.5 | 0.2 | | 4.2 |
| Ks. Newman | 3.0 | 1.0 | 66.0 | 5.0 | | 1.0 | | | | 24.0 |
| Ks. Wesleyan | 33.0 | 6.0 | | 9.2 | | 7.2 | 0.2 | | | 44.4 |
| Marymount | 11.0 | 5.0 | 55.4 | 3.4 | 0.2 | 5.7 | 0.2 | 0.3 | | 18.8 |
| McPherson | 15.0 | 4.6 | 12.2 | 7.1 | | 5.0 | 3.1 | 33.0 | | 20.0 |
| Ottawa | 6.3 | 6.4 | 8.4 | 50.8 | | 2.2 | 0.3 | | 18.9 | 6.7 |
| St. John's | 9.0 | 1.0 | 1.0 | 2.0 | | 85.0 | | | | 2.0 |
| St. Mary | 2.0 | 0.7 | 74.0 | 4.0 | 0.3 | 3.0 | 0.5 | | | 15.5 |
| St. Mary Pl. | 6.5 | 1.0 | 73.0 | 3.0 | | 1.5 | | | | 15.0 |
| Southwestern | 51.0 | 7.9 | 10.2 | 9.4 | | 8.4 | 1.0 | 1.0 | | 10.1 |
| Sterling | 18.0 | 44.0 | 3.5 | 11.5 | | 2.5 | 2.5 | | | 21.0 |
| Tabor | 4.7 | 1.3 | 1.7 | 11.7 | | 1.7 | 61.2 | 0.6 | | 17.1 |

ocally that the Colleges' doors are open to all.

The academic requirements for obtaining a degree at the Colleges are little different from that of state institutions of higher learning. The Colleges are all classified "liberal arts institutions" and they divide their curriculum into five general departments: humanities; social sciences; natural sciences and mathematics; fine arts; and education and behavioral sciences. To obtain a degree the student usually is required to take a number of courses from each of these departments regardless of his major. In harmony with a liberal arts education about two-thirds of the Colleges require their students to take at least one religion course as part of their humanities requirement.[9] Generally the student is free to select the course; oftentimes he may choose a course which treats the Bible as literature or history. In some Colleges the religion requirement may be fulfilled by taking studies in philosophy or ethics. Religion courses taught at the Colleges, interestingly enough, are little different from those offered at state institutions.[10] In fact all 19 Colleges will accept for academic credit comparable courses in religious studies from state supported institutions of higher learning in Kansas.

Whatever religious studies are chosen at the Colleges, the evidence shows that they are all taught from an academic approach which encourages open investigation rather than dogmatic sectarian indoctrination. All of the evidence presented by students taking religion courses indicates the instructors are neutral in their approach and that all views, whether they are religious, agnostic or atheistic are solicited. There has been no evidence suggesting that one's view of religion affects his grade or status in the eyes of the faculty or administration.

Instructors in religion at the various Colleges support the concept of neutrality. Reverend Emeric Fletcher, who has taught religious studies at St. Mary's College, California; Kansas University, Lawrence; and Benedictine College, Atchison, states there is no difference in his approach to teaching in the public and private sector. The standards of professional preparation and competence, and the goals of sound scholarship and objectivity are obtained in both sectors. Professor John E. Toews, who has taught at Northwestern University, Evanston, Illinois; University of Waterloo, Waterloo, Ontario; and Tabor College, Hillsboro, states that he uses many of the same books and literature at Tabor as he did at Northwestern University and the University of Waterloo. He says that in neither the private nor the public sector has he felt compelled to ad-

---

9. The minimum number of religious courses required to take in several Colleges is three.

10. Some religion courses offered at the University of Kansas: Life and Teachings of Jesus; Christian Ethics in Contemporary Society; Basic Concepts of Christian Thought; Contemporary American Religious Thought; New Testament Theology; Contemporary Roman Catholic Theology; Studies in Theology.

Wichita State University: Life and Teachings of Jesus; Old Testament Studies; New Testament Studies; The Problem of Salvation; Religion in America; Current Religious Issues; Judaism; Religion and the Future.

University of Arizona: Christian Literature and Thought; Catholic Thought in the 20th Century; Protestant Thought in the 20th Century; Prophets of the Old Testament; Current Religious Thought; Judaic Philosophy.

Indiana University: The Christian Church in New Testament Times; Development of the Jesus Traditions; Paul and IIis Influence in Early Christianity; Christian Thought: from the Reformation to the Present; Religion in America; Religion and Social Issues.

University of Iowa: The Nature and Relevance of Biblical Thought; Modern Interpreters of Jesus; Religion and the Quest for Values; The Synoptic Gospels; Paul; New Testament Epistles; Protestant Faith; Theology of Luther; Theological Questions; Catholic Social Thought; Christian Marriage; The Catholic Faith; Problems in Catholic Theology.

here to the myth of objectivity or to pretend neutrality on issues and ideas. Professor Toews asserts he has as much freedom in the private sector as he did in the public. Duane K. Friesen, instructor of Bible and religion at Bethel College, and assistant professor of religion at Wichita State University, states that the content and methodology of his courses in the state university and the church related college are nearly identical. He refutes the suggestion that at church colleges an instructor must teach religion as dogma.

It is apparent from the evidence presented that religion courses in the College curriculum are taught from an objective and neutral point of view. Often the courses are tied in with philosophy, psychology, sociology or other disciplines and are taught as one of the phenomena of human existence rather than as a creed for students to accept. Thus the approach to teaching religious courses does not differ from the methods used to teach English, political science or any other humanities course.

The emphasis on religious studies does not appear to be excessive at these Colleges. The number of religion courses taught is not inordinately high to the total number of courses offered. On the average about 3.5 percent of the courses offered are related to religion.[11] Nor does it appear the Colleges graduate an unusually high number of students majoring in religious studies. During the school year 1971–72 less than 2% of the graduating students majored in religion.[12]

There appears to be little church influence over the curriculum at most of the Colleges. In fact, academic policy is left to the faculty and dean of the college rather than any quasi-religious

11. Percentages of courses related to religion: Baker University, 2.7%; Benedictine College, 3.6%; Bethany College, 1.6%; Bethel College, 2.9%; College of Emporia, 2.3%; Donnelly College, 5.7%; Friends University, 3.4%; Hesston College, 3.7%; Kansas Newman College, 2.7%; Kansas Wesleyan, 2.- 1%; Marymount College, 3.2%; McPherson College, 1.7%; Ottawa University, 3.2%; St. John's College, 9.6%; St. Mary College, 3.8%; St. Mary of the Plains, 2.2%; Southwestern College, 2.0%; Sterling College, 4.- 2%; Tabor College, 4.5%.

| 12. Degrees Conferred, 1971–72 (Number) | | |
|---|---|---|
| College | Total | Religious Major |
| Baker University | 162 | 1 |
| Benedictine College | 484 | 10 |
| Bethany College | 100 | 0 |
| Bethel College | 89 | 0.5 |
| College of Emporia | 142 | 0 |
| Donnelly College | Not available | |
| Friends University | 150 | 11 |
| Hesston College | 137 * | Not Available |
| Kansas Newman College | 108 | 0 |
| Kansas Wesleyan | 130 | 2.5 |
| Marymount College | 109 | 0 |
| McPherson College | 141 | 0 |
| Ottawa University | 183 | 4 |
| St. John's College | 50 * | 2 |
| St. Mary College | 104 | 2 |
| St. Mary of the Plains | 129 | 0 |
| Southwestern College | 151 | 3 |
| Sterling College | 133 | 5.5 |
| Tabor College | 85 | 1.5 |

* Associate Degrees

body.[13] In only one instance did we find that academic policy has religious overtones.[14]

The final part of these findings centers around the role religion plays on campus, including the character and extent of religious activities. Unquestionably the opportunity for students to partake of religious activities exists at the Colleges. All of them have at least some of the following religious activities: chapel services; religious emphasis week; Campus-Y (YMCA–YWCA); Fellowship of Christian Athletes; chapel choir; religious retreats; church youth fellowship clubs; and youth conferences. These activities, however, represent only a small portion of the activities on any College campus. Like other institutions of higher learning, the Colleges also have many academic and honorary societies, college clubs, music groups, drama organizations, debate teams, and so forth.

Plaintiffs have presented no evidence that any of the religious activities enumerated above are mandatory on the students. In relation to chapel or worship services, there has been no evidence of compulsory chapel at any college.[15]

13.

| College | Responsible for Determining Academic Policy |
| --- | --- |
| Baker | President, dean and faculty |
| Benedictine | Faculty |
| Bethany | Faculty with approval of Board of Directors |
| Bethel | Faculty |
| Col. Emporia | Dean of the college |
| Donnelly | Faculty and administration under broad policy of board of trustees |
| Friends | Faculty |
| Hesston | Dean and his administrative academic counsel |
| Ks. Newman | Faculty |
| Ks. Wesleyan | Board of trustees has final authority |
| Marymount | Faculty |
| McPherson | Education policy committee of faculty, subject to ratification by faculty, and board of trustees |
| Ottawa | President and faculty |
| St. John's | Faculty develops and adopts, board of control approves; denominational board periodically reviews |
| St. Mary | Faculty |
| St. Mary Pl. | Faculty |
| Southwestern | Dean's academic council of faculty |
| Sterling | Academic affairs committee of board and faculty |
| Tabor | Faculty |

14. Bethel College requires all seniors to take an oral examination before graduating. Each year two books are chosen, one of current or historical interest and the other from the Bible. The examination includes topics related to Christian faith and the student's philosophy of life. The examination's purpose, among other things, is to provide students with a specific occasion to talk seriously about intellectual and spiritual development and philosophy of life. Following the examination, the examination committee prepares an evaluation report; if the performance is deemed inadequate the student may be asked to repeat the examination.

15. Although the stipulations suggest none of the colleges has an absolute policy relating to compulsory chapel, we find that three colleges have a policy toward religious services on campus which in effect fosters religion. Sterling College requires attendance at Monday and Wednesday chapel services unless the student has a valid reason for missing them. Chronic absences may lead to dismissal. Tabor College requires the student and faculty to assemble three times per week in order to, inter alia, enhance the spiritual life of the college community. Hesston College apparently does not require chapel attendance, but extended absences from chapel may become the basis in part for dismissal.

Nor has there been any evidence suggesting that any of the religious activities are either implicitly or explicitly mandatory. In fact, the only evidence we have on the subject suggests that all these activities are voluntary. A student may participate or not, depending upon his personal wishes.

Nothing leads us to believe that a student is ostracized, condemned or ridiculed for his personal beliefs. No evidence indicates that a student is pressured by fellow students, the faculty or the administration into participating in religious activities or adhering to a sectarian belief. Obviously religion is present on the campuses of church related colleges, but it is present only to the degree desired by the student. The facts indicate that on most campuses religion is a neutral force, neither demanding nor rejecting adherence by students.[16]

## II. CONCLUSIONS OF LAW

A. Denial of Equal Protection of the Laws.

 Plaintiffs first attack the portion of the Statute which limits financial assistance to only those prospective college students who choose to attend one of the nineteen church-related colleges. They argue this classification denies plaintiffs equal protection of the right to benefit from public funds. If the Statute's primary purpose is to aid college students, plaintiffs suggest, any college which is accredited should suffice. They further urge even if the Statute were enacted to aid Kansans who need public financial assistance, the Statute arbitrarily classifies students at church related institutions of higher learning as worthy of receiving tuition grants while denying students at state colleges and universities the same classification. Although there is some doubt in our minds as to plaintiffs' standing to allege an equal protection violation, the question has been raised and we will proceed to answer it. Plaintiffs argue the Statute creates invidious class discrimination based solely upon the choice of college or university selected by the student to further his education. The law is well settled, however, that the equal protection clause of the Fourteenth Amendment does not deny a state the power to treat different classes of persons differently; what the clause does prohibit is legislation treating those statutorily imposed classes differently based upon criteria wholly unrelated to the objective of the statute. If the statutory classification is reasonable, and rests on some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly situated are treated alike, there is no violation of the equal protection clause. Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L. Ed.2d 225 (1971); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L. Ed.2d 491 (1970). While the Statute in question establishes a class of students limited to those attending private colleges, the Statute in no way discriminates against the class of students attending state colleges and universities. Any student attending a state institution of higher learning automatically receives state aid at least equal to the amount a student may receive under the tuition grant program. Admittedly two classes of college students exist, but both are treated similarly and thus the Statute creates no discrimination between the two classes.

 Assuming arguendo the Statute does produce unequal treatment, plaintiffs still have failed to show that the Statute bears no rational relationship to legitimate state purposes. As noted in Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), "education is perhaps the most important function of state and local governments." And education is en-

---

16. There are a few exceptions to this conclusion which will be discussed in another part of the opinion.

hanced by the role private institutions play in raising national levels of knowledge, competence and experience. Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). The State therefore has a legitimate interest in advancing the welfare of its college population and of its private educational institutions.

 Plaintiffs in effect are asking us to delve into the State's policies relating to economics and social welfare. The equal protection clause, however, allows states wide latitude in effecting policies in these two areas and federal courts have no power to determine the sagacity of these policies. Our authority is limited to determining whether there is a reasonable basis for the policy. Dandridge, supra. The Statute was enacted to provide needy students with financial assistance to attend private colleges and to indirectly give the private colleges financial aid so that they could remain open. Such a purpose not only benefits the eligible students and private colleges, it also provides an economic benefit to the state. We find these reasons for enacting the Statute to be legitimate and therefore reject any suggestion that the equal protection clause has been violated. *See* Money v. Swank, 432 F.2d 1140 (7th Cir. 1970).

B. First Amendment Violations.

Although we find the Statute to be in harmony with the equal protection clause, this does not mean it is free from constitutional infringement. Indeed, the Supreme Court has gone so far as to hold that even if the equal protection clause would compel a certain course of action, it cannot be used as a "bludgeon with which to compel a State to violate other provisions of the Constitution." Sloan v. Lemon, 413 U.S. 825, 834, 93 S.Ct. 2982, 2988, 37 L.Ed.2d 939 (1973). We therefore shift to the First Amendment issues to determine whether that amendment's safeguards are being infringed by the Kansas tuition grant program. If they are, we must hold the Statute unconstitutional regardless of its validity under the equal protection clause.

I. The Establishment Clause.[17]

The history of the First Amendment's establishment clause is a history of man's attempt to protect himself from the evils that inevitably result when the church and state become entangled. The First Amendment was adopted after our forefathers realized that even in colonial America religious persecution was widely practiced. In many localities Catholics were hounded because of their faith, Quakers often were sent to jail and Baptists were considered obnoxious to the controlling Protestant sect. Members of minority faiths in particular localities were persecuted because they would worship God only as their own conscience dictated. And while they were being persecuted these dissenters were compelled by law to pay tithes and taxes to support government sponsored churches whose ministers preached inflammatory sermons which generated hatred against the dissenters. Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L. Ed. 711 (1947). No wonder the freedom loving colonials soon became shocked at what was happening around them. Unquestionably the establishment clause was included in the First Amendment as a protection against such circumstances ever occurring again. As Thomas Jefferson explained there was to be a wall of separation between church and state. See Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879). And in relation to an "establishment" of religion the separation was to be complete and unequivocal. Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). As Mr. Justice Black emphasized in Everson, supra, 330 U.S. at 15–16, 67 S.Ct. at 511–512:

The "establishment of religion" clause of the First Amendment means at

17. U.S.Const. Amend. I "Congress shall make no law respecting an establishment of religion, . . . ."

least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

 This wall of separation, however, was never meant to prohibit all contact between church and state. As Mr. Justice Douglas so clearly stated in Zorach, supra, if all contact were prohibited between church and state, policemen would not be allowed to help parishioners into their place of worship; prayers in our legislative halls would be prohibited; the proclamation making Thanksgiving Day a holiday would be unconstitutional; and all references to God running through our laws, our public rituals, and ceremonies would be flouting the First Amendment. The Court's interpretation of the First Amendment indicates the establishment clause does not demand separation of church and state in all respects. For example, New York City's public schools were permitted to release, during school time, those students who wished to attend religious courses operated outside of the school building by a duly constituted religious body. Zorach, supra. New Jersey was allowed to spend tax dollars to pay the bus fares of parochial school pupils. Everson, supra. New York was permitted to order local school authorities to lend textbooks free of charge to students in grades 7 through 12 attending parochial schools. Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). And South Carolina was allowed to issue revenue bonds which provided to a Baptist-controlled college financial assistance in the construction of additional buildings and facilities. Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973).

 The principles to be gleaned from all these decisions is that the First Amendment absolutely prohibits any law respecting governmentally established religion or governmental interference with religion. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Outside of these two explicit areas, there "is room for play in the joints." Walz v. Tax Commission, 397 U.S. 664, 669, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970). Ultimately the decision of whether there is a separation of church and state will have to be based on the common-sense of the matter. Zorach, supra. The church and state are not aliens to each other and not all contact between them is unconstitutional.

 In the case under consideration we believe the central issue is whether or not public subsidies can be paid for students' tuition at church related colleges and universities. Plaintiffs forcefully argue the tuition grant program involves a state law respecting an establishment of religion and thus is absolutely unconstitutional. To decide this most important question we must analyze the tuition grant program using a three pronged test developed by the Court over many years. For the Statute to be constitutional it must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; and finally, the statute must not foster an excessive government entanglement with religion. Lemon, supra. It should be noted, however, that in applying this three pronged test plaintiffs have the burden of showing to what extent the

colleges and their supporting churches are related, Hunt, n. 8, supra; Allen, supra.

■ To satisfy the first prong of the test, the Statute must have a secular legislative purpose. The evidence convinces us the legislative purpose was secular and the statute in no way was intended to advance religion. The reason for enacting the Statute is simple economics; the cost of educating a college student is increasing annually. More funds must be provided for administration and faculty salaries, repair and maintenance of facilities, capital expenditures and so forth. As the college student population increases the only way to put a lid on state aid is to properly utilize existing facilities and faculties. The small private colleges already have the facilities to educate thousands of Kansas students yearly. It is therefore better to induce students to attend these private colleges than allow the Colleges to go under and then call upon taxpayers to pay the additional student tuition expenses at state colleges plus providing for attendant capital expenditures. The legislature is attempting to utilize all existing institutions to their optimum point and thereby reduce the state's financial responsibility for higher education.

A second reason for the tuition grant program is to give needy students financial assistance so they might attend the college of their choice. The result has been that many students who without the tuition grant program would not have attended any Kansas college are now staying within the state to further their education.[18]

We conclude the tuition grant program in no way depicts a sectarian legislative purpose. The legislature is concerned about insuring all its college students an opportunity to select the college of their choice while at the same time limiting the need for state support at institutions of higher learning. We do not find these reasons for enacting the program to be outside the legislature's scope of authority. See Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

Plaintiffs also argue that even if the Statute has a secular legislative purpose, its primary effect is to advance religion. In support of this contention plaintiffs cite three recent Supreme Court decisions dealing with aid to parochial schools: Committee for Public Education v. Nyquist, supra; Sloan v. Lemon, supra, and Levitt v. Committee for Public Education, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973).

The *Nyquist*, supra, case centers around a tuition reimbursement program. The facts surrounding that case began in May, 1972, when New York enacted a law establishing three financial aid programs for nonpublic elementary and secondary schools. The act provided direct money grants to qualifying nonpublic schools to be used for the "maintenance and repair" of facilities and equipment. It also provided tuition reimbursements to parents of children attending elementary or secondary schools providing the parents' annual taxable income was less than $5,000. Those parents who failed to qualify for tuition reimbursement could subtract from their adjusted gross income for state income tax purposes a designated amount for each dependent for whom they paid nonpublic school tuition. The Court, in striking down the New York statute, adopted the district court's finding that the qualifying institutions could be ones that provide religious in-

18. In the Governor's message to the 1973 Kansas Legislature, the State Education Commission report on the value of the tuition grant student aid program for independent colleges was quoted in part: "On the basis of the questionnaires completed by college representatives and by almost all tuition grant recipients approximately 500 students were attracted or maintained by an independent college because of the influence of the tuition grant program. Of these students, approximately 50% or 250 students would not have attended any Kansas college."

struction to students. After finding that qualifying schools could provide religious educational functions, the Court concluded that the statute's effect was to provide financial support for nonpublic, sectarian institutions and was therefore unconstitutional.

The same conclusion was reached in Sloan, supra. In that case Pennsylvania reimbursed parents for a portion of tuition expenses incurred in sending their children to nonpublic elementary and secondary schools. The Court, after determining that most of the nonpublic schools are controlled by religious organizations whose principal purpose is to propagate and promote religion, held the statute's consequence was to preserve and support religion-oriented institutions and thus was violative of the establishment clause.

*Levitt*, supra, is a case factually different from *Nyquist* and *Sloan*. In *Levitt* the New York legislature appropriated funds to reimburse nonpublic elementary and secondary schools for performance of various services which are mandated by the state. The act provided for reimbursement to such nonpublic schools

for expenses of services for examination and inspection in connection with the administration grading and the compiling and reporting of the results of tests and examinations, maintenance of records of pupil enrollment and reporting thereon, maintenance of pupil health records, recording of personnel qualifications and characteristics and the preparation and submission to the state of various other reports . . . .

The Court, in striking down the statute, determined that under this program nonpublic schools with a religious mission were eligible for state funds. Because teachers under the authority of religious institutions might, unconsciously or otherwise, prepare examinations which inculcate students in the religious precepts of the sponsoring church, the statute constituted impermissible aid to religion.

Plaintiffs energetically argue that the Kansas tuition grant program is so similar to those programs struck down in *Nyquist, Sloan* and *Levitt* that it must be held violative of the establishment clause. Unlike those three cases, however, the primary problem in the instant case is not whether a state may provide financial aid to schools with a sectarian mission but whether those colleges eligible for state aid under the tuition grant program do indeed serve a sectarian mission. Only after determining whether they are religiously oriented can we decide whether the above three cases are controlling. And in resolving this question we are guided by Mr. Chief Justice Burger's statement on constitutional analysis: "This is not to suggest, however, that we are to engage in a legalistic minuet in which precise rules and forms must govern. A true minuet is a matter of pure form and style, the observance of which is itself the substantive end. Here we examine the form of the relationship for the light that it casts on the substance." Lemon v. Kurtzman, supra 403 U.S. at 614, 91 S.Ct. at 2112. If from the analysis we find the Colleges here involved serve an impermissibly sectarian purpose, then we must hold the tuition grant program to have the primary effect of advancing religion or religious education and therefore violative of the First Amendment.

To decide whether the church related colleges serve a religious purpose we must first analyze the structure and operation of the institutions. As pointed out in our findings all of the Colleges are church affiliated. While there is little direct denominational control over the institutions or financial support given to them, a very small degree of denominational influence is assured by College charters which require a majority of the corporate members to be members of the sponsoring church. Because of the charter requirement no doubt most College boards of trustees and directors are also members of the sponsoring church. Denominational influence will also be exercised through church

boards of higher education, these boards often wielding authority over the colleges' entire educational program. Church influence in some instances also is assured by the fact that College charters and by-laws provide denominational ownership of the Colleges' assets.

Any question concerning the Colleges' reason for existence is answered in their charters, by-laws and college bulletins. Unquestionably one of their objectives is to teach students the essentials of Christianity, and no doubt this objective is accomplished through chapel programs and religious organizations.

No College, however, requires religious affiliation as a prerequisite for membership on the faculty. Members of Christian faiths, of non-Christian faiths, and of no religious faith teach at the church Colleges. The evidence shows that faculty members are given absolute freedom in teaching their classes rather than being subject to ecclesiastical direction. Students are also admitted without regard to religion; although in some Colleges a majority of the students are members of the affiliating church this is not the result of religious discrimination. It is clear that not only are faculty members and students selected without regard to religious affiliation, they also enjoy a high degree of academic freedom. Just as would be the case at state institutions of higher learning, faculty and students at the Colleges are free to examine data, question assumptions, be guided by evidence and openly search for truth.

The curriculum appears to be little different from that at state colleges and universities. Generally the dean of the college and the faculty establish academic policy. The curriculum of each of the colleges involved does not contain a high percentage of religious courses nor do the Colleges graduate a large number of students majoring in religion. Although students must take some religion courses the evidence suggests these courses are taught as a human experience rather than as a sectarian dogma.

Religious activities do exist on the campuses but they are in most cases voluntary, either to be accepted or rejected by the college students. No proof has been offered by plaintiffs showing that in actual practice the students are in any manner forced to participate in religious activities. Nor has there been any evidence suggesting that religious influence is so pervasive at the Colleges, either from the administration, faculty or fellow college students, that a student feels compelled to act differently than his conscience dictates.

To sum up our analysis we must conclude that most of the Colleges: (1) operate with some small degree of denominational influence; (2) are governed to some extent by members of the sponsoring church; (3) receive minimal financial assistance from the church and in some instances are owned by the church; (4) impose no religious qualifications on the hiring of faculty members; (5) impose no religious restrictions on the admission of students; (6) offer a high degree of academic freedom to both the faculty and the students; (7) do not offer sectarian religion courses in their curriculum; and (8) allow students to voluntarily participate in religious activities.

Plaintiffs argue the mere fact there are some religious connections between the Colleges and churches is all that is necessary to invalidate the Kansas tuition grant program. We do not believe, however, that Supreme Court decisions on this subject dictate such a conclusion. As noted in Hunt v. McNair, supra 413 U.S. at 742, 93 S.Ct. at 2874, "the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected." *E. g.,* Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899); Walz v. Tax Comm'n, supra; Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). What the establishment clause does prohibit is state aid that has "a primary effect of advancing religion when it flows

to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission. . . ." Hunt at 413 U.S. 743, 93 S.Ct. at 2874. In *Hunt* the Court upheld the validity of a South Carolina statute which authorized state issuance of revenue bonds to institutions of higher learning, including church related colleges, to assist them in constructing and financing projects. The act was being challenged because South Carolina approved an application by a Baptist college requesting issuance of revenue bonds to finance capital improvements and completion of a dining hall at the college. The Court rejected the argument that merely because the college was religiously affiliated it was significantly oriented toward sectarian rather than secular education. This conclusion was reached even though the members of the college board of trustees were elected by the South Carolina Baptist Convention, approval by the convention was required for certain financial transactions, and a majority of the student body was Baptist.

The Court's decision in *Hunt* is grounded on the common sense realization that in a church related college religion need not so permeate the secular education that their religious and secular functions are inseparable. An earlier Supreme Court decision, Tilton v. Richardson, supra, set the groundwork for this conclusion. In *Tilton* the Higher Education Facilities Act of 1963 was being challenged because it granted federal aid to church related colleges and universities by way of construction grants for buildings and facilities to be used for secular education purposes. The suit was brought because four church-related institutions in Connecticut were receiving federal construction grants under this program. These schools were governed by Catholic religious organizations and the faculties and student bodies of each were predominantly Catholic. The Court, nevertheless, concluded that the institutions' predominant higher education mission was to provide students with a secular education and all four were therefore eligible for the construction grants. In reaching this conclusion the Court noted that: none of the institutions attempted to indoctrinate students or to proselytize; non-Catholics were admitted as students and were given faculty appointments; none of the colleges required students to attend religious services; although religion courses were required they were taught according to academic requirements of the subject matter and the teacher's concept of professional standards; and the schools all subscribed to a well established set of principles of academic freedom.

■ From the above mentioned cases we conclude that not all state aid to church related colleges has the primary effect of advancing religion. Plaintiffs, by relying on *Nyquist*, *Sloan* and *Levitt* overlook the unique characteristics of education at colleges and universities. The Court recognizes that aid to education does not necessarily have the same effect at church related institutions of higher learning that it does at parochial elementary and secondary schools. This is because the dominant policy of instruction at parochial schools is "to assure future adherents to a particular faith by having control of their total education at an early age," Walz v. Tax Comm'n, supra, 403 U.S. at 671, 90 S.Ct. at 1412, while at the college level the emphasis on academic freedom and the quest for truth necessitates absence of sectarian influence. Students at the college level are also more critical and therefore less susceptible to religious indoctrination. *Tilton*, supra. These inherent differences between the college level and the elementary and secondary level of education at church affiliated schools lead us to the conclusion that state aid to church related colleges might be valid even though similar aid to parochial schools would violate the First Amendment.

■ We do not believe the Kansas tuition grant program should be auto-

matically invalidated because the qualifying Colleges have a formalistic relationship with the sponsoring churches. Instead we will look at the overall operation of each institution to discern whether religion is so pervasive that a substantial portion of its functions is subsumed in the religious mission. *Hunt,* supra. We first note that with the exception of St. John's College no College imposes religious restrictions on admission of students. The facts readily show that students are admitted without concern for religious affiliation, the result being that most Colleges serve students of many faiths as well as those of no faith. St. John's College, however, reserves the right to give preference on enrollments to applicants from congregations of the Lutheran Church-Missouri Synod. It also requires all applicants to submit to the director of admissions a pastor's evaluation of the student.[19] We find that such a preferential church policy not only violates the express provisions of the Kansas tuition grant act but it causes money received from the tuition grant program to be used for the establishment of religion and is thus violative of the First Amendment.

■ A second consideration is whether the Colleges require attendance of pupils at religious activities. We do not believe that state aid must be disallowed because the opportunity for religious participation exists at these Colleges, *see Zorach,* supra, but if participation is either explicitly or implicitly mandatory then we must conclude the Colleges are serving primarily a religious purpose. The evidence shows, however, that only three Colleges require some form of religious participation by the students: Sterling College,

Tabor College and Hesston College.[20] Sterling College conducts chapel services twice weekly and unless the student has a valid reason for missing these services an excessive number of absences may lead to disciplinary probation or dismissal.[21] At Tabor College the entire student-faculty community assembles three times per week to "enhance the spiritual life of the community."[22] At Hesston College attendance at chapel services is not mandatory but absences are reported and become a part of the student's personal folder. Extended absences from chapel "may become the basis, in part, for students discontinuation as a student at Hesston College."[23] We find that because of the requirement of religious participation by students, state aid to these Colleges fosters religion and is therefore impermissible.

■ Third, do any Colleges require obedience by students to the doctrines and dogmas of a particular faith? Although no college requires student obedience to a particular faith we find at Bethel College a method of giving seniors oral examinations that implicitly forces students to verbally express belief in Christianity. All seniors at Bethel College are asked to take an oral examination before graduating. Each year two books are chosen, one of them always being from the Bible. Topics related to Christian faith may be raised to examine the student's intellectual and spiritual development. The examination's purpose, among other things, is to provide "faculty members and students with a specific occasion to talk seriously about intellectual and spiritual development and philosophy of life."[24] If the student does not perform satisfactorily he may be asked to repeat the examina-

19. St. John's College 1972–1974 Catalog, at 15–16.

20. We are cognizant of the stipulation filed herein concerning chapel attendance. Our findings in this regard are based on statements contained in the catalogs issued for the 1973–74 college year.

21. Sterling College 73–75 Catalog, at 35–36.

22. Tabor College Catalog '73–74, at 11.

23. Hesston College Catalog 1972–1974, at 33.

24. Bethel College Bulletin 1972–74, at 51.

tion. Such an examination policy inserts sectarian influence into the educational program; therefore the religious mission served by Bethel College is too pervasive to allow its participation in the tuition grant program.

■ Fourth, do the Colleges require pupils to attend instruction in the theology or doctrine of a particular faith? We find no evidence of sectarian indoctrination in the courses taught at church colleges. Although students at most of the Colleges must take courses in religion as part of their educational requirement, these courses are taught objectively and from a neutral point of view. Because these courses are taught from an academic approach which encourages open investigation we find no violation of the First Amendment. See Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

Fifth, are the Colleges an integral part of the religious mission of the church sponsoring them? After reading through the charters, by-laws and college bulletins we conclude the Colleges have religious reasons for existing. But the evidence does not suggest that sponsoring churches use the Colleges as tools for religious propaganda. Nor in most instances do the Colleges teach church dogma or attempt to indoctrinate their students in the Christian faith. The religious mission is today served by providing students with the *opportunity* for religious involvement, and the degree of involvement is left totally to the students. The church colleges neither lure students into religious participation by offering an unusually high number of religion courses nor provide the students with a large number of religious activities. Religion, therefore, is not so pervasive on the college campuses that students cannot receive a secular education.

Sixth, do the Colleges have as a substantial purpose the inculcation of religious values? We do not find from the evidence offered that church colleges try to instill religious values in their stu-

dents. No doubt through chapel services and religious organizations the opportunity exists for instillment of Christian values, but these functions are voluntary. Besides, the skeptical mind of college students limits the effect of any such attempt.

Seventh, do the Colleges impose religious restrictions on faculty appointments? As noted previously no College has religious restrictions on faculty appointments; the facts show that Christians, non Christians and non-believers teach at these Colleges.

Finally, do the Colleges impose religious restrictions on what or how the faculty may teach? No. All faculty members are given a high degree of academic freedom in teaching their courses.

In conclusion we find that most of the Kansas church colleges provide a primarily secular education. The Colleges do not constitute an integral part of the religious mission of the sponsoring churches nor do their unique characteristics make then a vehicle for inculcating religious doctrine. The result is that all students, including those majoring in religion, receive a liberal arts, secular education. There are five Colleges—Bethel, Hesston, St. John's, Sterling and Tabor—however, that serve a substantially sectarian mission. The tuition grant program with respect to these five Colleges has the effect of fostering religion and is therefore violative of the First Amendment's establishment clause. Nyquist, supra; Sloan, supra; Levitt, supra. With respect to the other Kansas church colleges there is no primarily sectarian mission being served and hence no infringement of the establishment clause. Hunt, supra; Tilton, supra.

We realize there is a factual difference between the situations in *Hunt* and *Tilton* and the situation in the present case. In *Hunt* and *Tilton* the challenged statutes merely provided to church colleges government aid for the construction of non-sectarian buildings and facilities. It was easy for the Court to seg-

regate the purposes for which the buildings and facilities would be used. In our case the tuition grant program provides financial aid to students attending church colleges. There is no way we can be sure the students will not take part in religious activities. We do not believe, however, that the tuition grant program is unconstitutional because some recipients become involved in religious activities. The church colleges in most cases do not force religion on any students. The opportunity is there for religious participation but the degree of involvement depends totally upon the student. Religious participation is voluntary and is thus distinct from the education received at these church colleges.

The Constitution never intended the wall between church and state to be absolute. As Mr. Justice Douglas emphasized in *Zorach* "[w]e are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. . . . We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal and its adherents and the appeal of its dogma." 343 U.S. at 313, 72 S.Ct. at 684. The government's attitude toward religion is one of neutrality. Walz, supra. Thus, whether a tuition grant recipient chooses to participate in religious activities makes no difference to the government. Our concern is not whether students at church colleges participate in religious activities but whether the Colleges either explicilty or implicitly subject the students to sectarian influence. And as we noted earlier in most instances a secular education is being provided by these Colleges. In *Hunt* and *Tilton* the government provided financial support for construction of secular buildings and facilities. In the present case the government is providing financial aid for a secular education. No doubt some of the students using the secular buildings and facilities in *Hunt* and *Tilton*, just as some of the students receiving a tuition grant in the present case, participated in

religious activities. But in all three situations the church colleges are providing a primarily secular function and thus government aid does not have the effect of respecting an establishment of religion.

■ Although a statute may survive the "legislative purpose" and "primary effect" tests, it still will be struck down if it creates an excessive and enduring entanglement between church and state. Lemon, supra. In considering entanglement two aspects must be analyzed; first, does the administration of the statute cause excessive entanglement and second, does the statute create among the electorate the potential for political discordance along religious lines?

With respect to the administrative entanglement aspect we note that the basic reason for enacting the Kansas tuition grant program was to assist needy students in attending independent colleges. This statute does not provide funds which are earmarked for religious purposes but rather provides funds for payment of tuition costs. The money no doubt goes into each College's general fund to be used for operation purposes. While it can be argued that such a tuition grant program in effect allows funds from other sources to be spent for religious purposes the Supreme Court on several occasions has rejected this reason for denying state assistance to religious institutions. Hunt, supra; Tilton, supra; Walz, supra.

■ Although a tuition grant program would usually cause impermissible entanglement between church and state at the elementary and secondary education level, such a program does not necessarily cause excessive entanglement at the college level. The degree of entanglement varies in large measure with the extent to which religion permeates the institution. Lemon, supra; Tilton, supra. As Mr. Chief Justice Burger pointed out for the plurality in *Tilton:*

Since religious indoctrination is not a substantial purpose or activity of these church-related colleges and uni-

versities, there is less likelihood than in primary and secondary schools that religion will permeate the area of secular education. 403 U.S. at 687, 91 S.Ct. at 2100.

Because secular education is emphasized at the Kansas independent Colleges, the necessity for government surveillance is reduced and the resulting entanglement between government and religion is lessened. See Tilton, supra.

Another reason for there being no administrative entanglement is because the Kansas Statute primarily is directed toward individual student applicants rather than the independent Colleges. In fact, the only pertinent section of the Statute relating to independent Colleges is K.S.A. 72–6111(f) which states:

The [state education] commission may require any accredited independent institution to promptly furnish any information which the commission requests relating to administration or effect of this act.

Section 72–6111(f) gives the commission authority to demand information concerning the tuition grant program from church colleges; it does not give them authority to interfere with the operation of the Colleges.

The second aspect of the entanglement doctrine involves "political entanglement". While democratic government functions best when there is active political involvement, the very purpose of the First Amendment is to prevent political activity that fractionalizes the electorate along religious lines. Lemon, supra. Thus government aid to elementary and secondary parochial schools is often prohibited because political debate and division along religious lines might exist in the numerous communities where these schools operate. At the college level, however, the potential for political fragmentation is unlikely. In Kansas there are nineteen eligible church colleges operating in sixteen local communities. As noted earlier these Colleges serve a primarily secular educational purpose and attract students of all faiths from throughout the world. Because of the diversity of students and faiths represented on all the campuses, political involvement is less likely to be split along religious lines. Tilton, supra.

We conclude that Kansas' tuition grant program generates no impermissible involvement between the government and state. The statute creates neither an administrative nor political entanglement and therefore does not violate the establishment clause.

## II. The Free Exercise Clause.[25]

 Plaintiffs finally contend the Kansas tuition grant program offends the free exercise clause of the First Amendment. Although plaintiffs have not explained how the Kansas tuition grant program violates the free exercise clause we assume it is because they are compelled to pay taxes, the proceeds of which in part finance grants under the Statute. The Supreme Court on numerous occasions has rejected this argument, however, because more is needed to show a free exercise violation than the fact plaintiffs are taxpayers. Tilton, supra; Walz, supra; Allen, supra. In a free exercise case plaintiffs must show "the coercive effect of the enactment as it operates against him in the practice of his religion." Abington School Dist., supra, 374 U.S. at 223, 83 S.Ct. at 1572. Plaintiffs have made no attempt to show how the Kansas tuition grant program operates against them in the practice of their religion.

## III. CONCLUSION

 From a careful scrutiny of the "tuition grant" statute and the findings of fact made herein, we conclude K.S.A. 72–6107 et seq. is not unconstitutional. However, as indicated above, we do find some constitutional infirmities in the administration of the Act. The five Colleges, Bethel, Sterling, Hesston, St.

---

25. U.S.Const. Amend. I "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . ."

John's and Tabor, because of the findings heretofore made as to each of them, are not entitled to participate in the program. Therefore, the defendants are enjoined from extending any further tuition grants to students attending those five institutions. This decree shall be prospective in application and no student or institution will be required to pay back to the state any money heretofore granted by the defendants under the Act in question.[26] Also, each of the five institutions listed above may again become eligible to participate in the tuition grant program by taking appropriate action to eliminate the particular infirmities found herein as a bar to participation.

This opinion shall constitute the findings and conclusions of the court. Counsel for the defendants shall prepare and submit an appropriate Decree in accordance herewith, for signature by the members of the court and for filing.

WESLEY E. BROWN, Chief District Judge (concurring).

I concur in the opinion of this Court. Because of my strong feelings, however, that the decisions we are required to follow have the effect of prohibiting the free exercise of religious and academic freedom, I must speak out.

In the case before us we are dealing with grants to students who, by legislative fiat, are not children but adults with all of the responsibilities and obligations of adulthood.

It is clear also as we have said that the law, K.S.A. 72–6107 et seq., is on its face plainly constitutional by any standards involving First Amendment prohibitions. In Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723, we are advised that a school by school determination was required to determine that state aid is confined to secular education. The Court there said, "This school by school determination may be cumbersome but no more so than the State's process of ascertaining compliance with educational standards. No presumptions flow from mere allegations; no one can be required, consistent with due process, to prove the absence of violation of law."

Thus under the law cited in our opinion we have been required to hold that the five colleges, because they require attendance at chapel or knowledge of a particular religious view, are fostering religion. Bethel College, in addition, goes somewhat further in its policies and in effect requires an adherence to its sectarian dogma.

Except for this action by Bethel I find no more sectarian adherence than a requirement by a college that in order to obtain a degree the student must have sufficient understanding and pass a course in English or a foreign language as a requirement to a degree.

The standards of academic freedom at the college level requires, not only the right to study a religious concept, but also a non-religious concept. The heretic teaching is as much a requirement of academic freedom as the advocacy of religious thought. The teaching of either discipline is a form of constitutionally required religious freedom.

As was pointed out by Justice White in his dissent in Committee for Public Education v. Nyquist, supra, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 985, not all state aid to religion is completely barred in view of tax exemptions, bus transportation, and books which are provided to churches and parochial schools by many states.

It is time to paint with a broad brush and hold that a tuition grant to permit study at a religiously oriented college is not fostering religion. It is merely giving a grown man or woman the right to study secular and/or sectarian ideas as the individual sees fit. Only by such a policy will we have both academic and religious freedom. At the same time such policy would permit the use of facilities of private schools as an aid to

26. Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L.Ed.2d 745 (1973).

education at the college level even though religiously oriented.

## APPENDIX "A"

### Article 61.—TUITION GRANTS FOR PRIVATE INSTITUTIONS

72–6107. Definitions. As used in this act, unless the context otherwise requires: (a) "Tuition grant" means an award under this act by this state to a qualified student.

(b) "Financial need" means the difference between a student's available financial resources and such student's total anticipated expenses to attend a certain accredited independent institution. A student's financial resources shall include (1) four hundred and fifty dollars ($450) each year from his own work and resources, and (2) a contribution from his parents' income and assets, if sufficient, as determined by a completed parents' confidential statement and based upon the accepted criteria of a nationally recognized financial needs analysis agency. Financial need shall be redetermined at least annually.

(c) "Full-time in-state student" means a person who is a resident of Kansas and who is enrolled at an accredited independent institution in a course of study of at least twelve (12) hours each semester or the equivalent thereof. The commission shall determine the number of hours for terms other than semesters to constitute the equivalent of twelve (12) hours.

(d) "Qualified student" means a full-time in-state student who has established financial need and who is initially acceptable for entering an institution of higher learning or who has so entered and is in good standing and making satisfactory progress toward graduation.

(e) "Accredited independent institution" means an institution of higher learning located in Kansas which (1) is operated independently and not controlled or administered by any state agency or any subdivision of the state, (2) maintains open enrollment, and (3) is accredited by the north central association of colleges and secondary schools accrediting agency based on their requirements as of April 1, 1972.

(f) "Open enrollment" means the policy of an institution of higher learning of the opportunity of enrollment for any student who meets its academic and other reasonable enrollment requirements, without regard for race, sex, religion, creed or national origin.

(g) "Commission" means the state education commission established by K.S. A.1971 Supp. 72–6204.

(h) "Term" means one of two or more divisions of an academic year of an institution of higher learning in, which substantially all courses begin and end at substantially the same time, and during which instruction is regularly given to students.

(i) "Semester" means one of two principal terms, when there are only two principal terms in the academic year, whether or not there are other shorter terms during the same academic year.

72–6108. Awarding tuition grants; semesters limitation. A tuition grant may be awarded to any qualified student enrolled at any accredited independent institution, except that a qualified student may receive tuition grants for not more than eight (8) semesters of undergraduate study or the equivalent thereof. The commission shall determine the equivalent of eight (8) semesters when all or part of the terms for which a student receives tuition grants are not semesters.

72–6109. Amount of tuition grant to equal financial need; limitations. The amount of a tuition grant to a qualified student for the fall and spring semesters, or the equivalent thereof, shall be the amount of such student's financial need for the period, except that tuition grants to a student in any year shall not exceed the lesser of:

(a) The total tuition and required fees of that student for two semesters, or the equivalent thereof, or

(b) one thousand dollars ($1,000).

When tuition grants are received by a student for one or more terms that are not semesters, the commission shall determine what is the equivalent of the fall and spring semesters.

72–6110. Payment of tuition grants; how certified and approved; dropout liability. A tuition grant may be made annually for both the fall and spring semesters, or the equivalent thereof. Payments under any such tuition grant shall be allocated equally between the semesters, when the student plans to attend two semesters in an academic year, and otherwise as specified by the commission. Tuition grants shall be paid at the beginning of each semester or other term upon certification by the accredited independent institution that the student is enrolled and is a qualified student. Payments under any tuition grant shall be made upon vouchers approved by the administrative officer of the commission designated by it, and upon receiving the same the director of accounts and reports shall issue his warrant to the student entitled thereto and shall cause such warrant to be delivered to the accredited independent institution in which such student is enrolled. If a student discontinues attendance before the end of any semester or other term, after receiving payment under a tuition grant, the entire amount which such student would otherwise qualify to have refunded, up to the amount of any payments made for tuition grants in the academic year, shall be paid by the accredited private institution to the state.

72–6111. Administration of act by state education commission; rules and regulations; apportionment of grants; qualification of institutions; information and reports. The state education commission shall administer this act and shall:

(a) Provide application forms and forms for parents' confidential statements.

(b) Adopt rules and regulations for determining financial need, selecting financial needs analysis agencies, defining tuition and required fees, determining priority or apportionment of tuition grants and other matters necessary for the administration of this act. The commission may provide for apportionment of tuition grants if the appropriations for tuition grants are insufficient to pay all approved tuition grants. To determine who is an in-state student for the purpose of this act, the commission shall adopt rules and regulations consistent with statutes for determination of in-state students in universities and colleges under the state board of regents.

(c) Approve and award tuition grants.

(d) Determine those institutions of higher learning which qualify as accredited independent institutions.

(e) Make an annual report to the governor and legislature, and evaluate the tuition grant program for the period.

(f) The Commission may require any accredited independent institution to promptly furnish any information which the commission requests relating to administration or effect of this act.

72–6112. Applications for grants; parents' confidential statements. Each applicant for a tuition grant, in accordance with the rules and regulations of the commission, shall:

(a) Complete and file an application for a tuition grant.

(b) Be responsible for the submission of the parents' confidential statement to the commission and to the institution of higher learning at which such student is enrolling.

(c) Report promptly to the commission any information requested relating to administration of this act.

(d) File a new application and parents' confidential statement annually on the basis of which his eligibility for a tuition grant shall be evaluated and determined.