**Jim LENDALL, Plaintiff,**

v.

**M. Olin COOK, as Director of Arkansas Department of Higher Education, Defendant,**

**Elizabeth Ann Bishop, Mark S. Carter, Patricia Christine Hipp, Jerry House, Gale Houston, Deborah S. Moore, Dale W. Williams, and Alan Woodfield, Intervenors.**

**No. LR–75–C–287.**

United States District Court, E. D. Arkansas, W. D.

May 27, 1977.

Jim Lendall, pro se.

Sam I. Bratton, Asst. Atty. Gen., Lonnie A. Powers, Deputy Atty. Gen., Little Rock, Ark., for defendant.

Edward L. Wright, Philip S. Anderson, Wright, Lindsey & Jennings, Little Rock,

Ark., Charles H. Wilson, Pierce O'Donnell, Williams, Connolly & Califano, Washington, D.C., for intervenors.

Before HENLEY, Circuit Judge, and EISELE and SHELL, District Judges.

EISELE, Chief District Judge.

## MEMORANDUM OPINION

This case concerns the constitutionality of the Arkansas State Scholarship Program under the Establishment Clause of the First Amendment.

*Facts*

The Scholarship Program was enacted in 1975. Ark.Stat.Ann. §§ 80–3374–3388. Its express purpose is to further the welfare and security of the state and nation by enabling deserving students to obtain higher education. § 80–3374. The Act provides for scholarships for qualifying students attending "approved" public or private colleges in the state. § 80–3376. Students qualify on the basis of need and academic ability. § 80–3377. "Approved" institutions are defined as follows:

"(b) 'Approved private institution' means a two year or four year institution of higher education, dedicated to educational purposes, located in Arkansas which (1) is operated privately under the control of an independent board and not directly controlled or administered by any public agency or political subdivision; *(2) restricts the use of public funds to educational programs with a secular purpose;* (3) provides at least a collegiate level course of instruction for a minimum of two [2] years, leading or directly creditable toward an associate or baccalaureate degree; (4) is accredited by an accrediting agency certified and recognized by the United States Office of Education, or as a school giving satisfactory assurance that it has the potential for accreditation and is making progress which, if continued, will result in its achieving accreditation; *(5) does not discriminate in the admission of students on the basis of race, color, religion,* sex or national origin and

is in compliance with the Federal Civil Rights Acts of 1964 and 1968 and Executive Orders issued pursuant thereto; *(6) subscribes to the principle of Academic Freedom.* [Emphasis added.]

"(c) 'Approved public institution' means a two year or four year institution of higher education, dedicated to educational purposes, located in Arkansas which (1) is directly controlled or administered by a public agency or political subdivision; (2) receives appropriations directly or indirectly from the General Assembly for operating expenses; (3) provides a collegiate level course for a minimum of two [2] years, leading to or directly creditable toward an associate or baccalaureate degree; (4) is accredited by an accrediting agency certified and recognized by the United States Office of Education, or as a school giving satisfactory assurance that it has the potential for accreditation and is making progress which, if continued, will result in its achieving accreditation; (5) does not discriminate in the admission of students on the basis of race, color, religion, sex, or national origin and is otherwise in compliance with the Federal Civil Rights Acts of 1964 and 1968 and Executive Orders issued pursuant thereto; (6) subscribes to the principle of Academic Freedom."

§ 80–3375. The scholarships are available only during a student's freshman year, in the maximum amount of $300. §§ 80–3378–79. The funds are paid directly to the student. § 80–3378. The Arkansas Department of Higher Education is charged with administering the program. § 80–3381.

The legislature appropriated approximately $61,000 in scholarship funds for 1975–76 and $494,000 for 1976–77. (Defendant's exhibit 3.)

As an initial step in implementing the Act, the Director of Higher Education circulated questionnaires to each public and private college in Arkansas for purposes of determining whether they met the statutory requirements for approved institutions. It appears that there are 12 private colleges

in the state, all of which have some religious orientation. Each of the 12 private college presidents stated that his institution would restrict the use of public funds to educational programs having a secular purpose. The responses, however, raised other questions of eligibility, concerning accreditation and academic freedom, with respect to three private colleges. The questions were referred to the Attorney General. By Opinion No. 75-100, dated September 3, 1975, the Attorney General stated, *inter alia*, that certain religiously oriented colleges might not satisfy the statutory criterion of subscribing to the principle of academic freedom, and, further, that treating certain religiously oriented colleges as approved institutions might place the state in the position of advancing religion in violation of the First Amendment. The Attorney General suggested that the private colleges be evaluated under the following standards, articulated in *Americans United for Separation of Church and State v. Bubb*, 379 F.Supp. 872 (D.Kan.1974) (three-judge court):

"(1) does the college impose religious restrictions on admission of students?

"(2) does the college require attendance of pupils at religious activities?

"(3) does the college require obedience by students to the doctrines and dogmas of a particular faith?

"(4) does the college require pupils to attend instruction in the theology or doctrine of a particular faith?

"(5) is the college an integral part of the religious mission of the church sponsoring it?

"(6) does the college have as a substantial purpose the inculcation of religious values?

"(7) does the college impose religious restrictions on faculty appointments?

"(8) does the college impose religious restrictions on what or how the faculty may teach?"

He stated that one or more affirmative responses might indicate that the school in question is so permeated by religion that granting a scholarship to an attending student might have the primary effect of advancing religion.

The Board of Higher Education, thereafter, circulated additional questionnaires delving into the areas suggested by the Attorney General. On October 3, 1975, after considering the responses, the Board voted to approve nine of the 12 private Arkansas colleges. As to the remaining three, Crowley's Ridge College, Central Baptist College and John Brown University, action was deferred due to the apparent heavy religious orientation of these schools.

John Brown University later submitted additional information to the Board. On July 10, 1976, the Board voted to approve that institution. It appears, then, that at present 10 of the 12 private colleges in the state are deemed to be approved institutions.

*Proceedings*

On September 23, 1975, Jim Lendall, as an Arkansas taxpayer, commenced this action against M. Olin Cook, Director of the Department of Higher Education, alleging that the scholarship program was violative of the establishment clause of the First Amendment insofar as it provided funds to students attending any of the 12 private colleges in the state. Plaintiff sought an injunction against the expenditure of public funds for scholarships to private colleges, and a declaration that the Act is unconstitutional.

On February 13, 1976, the Court granted leave to intervene as defendants to eight persons, all of whom were first year students at public or private Arkansas colleges and were qualified for state scholarships. Seven of the intervenors, six of whom attended private colleges, actually received scholarships. Deborah S. Moore, the eighth intervenor, was awarded a $250 scholarship for 1975–76, but the award was revoked after the Board failed to approve John Brown University, the school she was attending.

A three-judge court has been convened. An evidentiary hearing was held on August

31, 1976. Arguments were heard on October 22, 1976.

Essentially, three different positions are being asserted by the respective parties on the merits of this lawsuit. Plaintiff contends that providing scholarships to students attending any of the 12 private Arkansas colleges is unconstitutional. Defendant Cook contends that, as properly interpreted, the Act limits approved schools to those that are not overly permeated by religion, and that, as applied, the Act is constitutional. Defendant-intervenors contend that, as properly interpreted, the Act does not exclude heavily religious schools from the category of approved schools. They further argue that the Act is constitutional nonetheless since it provides aid to students, not institutions.

*Abstention*

■ A threshold question arises as to whether the Court should abstain in the case and allow the Arkansas Supreme Court to initially consider certain issues concerning the Act. Two potential grounds for abstention are presented by this case. First, the defendant and defendant-intervenors urge different constructions of the Act as to its applicability to private colleges, and the state courts have not had occasion to authoritatively construe the Act on this point. While neither construction would remove the constitutional issue from the case, the constitutional issue is, nevertheless, cast in a significantly different posture according to which interpretation of the Act is adopted. The Supreme Court has held that abstention may be proper where an authoritative construction of a state statute might materially change the nature of the constitutional issue presented. *See, e. g., Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Second, plaintiff has injected an issue as to whether the Act violates the *Arkansas* constitutional provision dealing with separation of church and state. *Ark. Const.*, Art. 2, § 24. Abstention may be proper where a

resolution of the state constitutional claim might obviate the need to resolve the federal constitutional claim and the state constitutional provision does not mirror a similar provision in the federal constitution. *See, e. g., Examining Bd. of Engineers v. Flores de Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *Herald Co. v. McNeal*, 553 F.2d 1125 (8th Cir., 1977).

■ It is important to note that abstention should not automatically follow upon a determination that there is a permissible basis therefor; rather, a careful consideration of the particular facts and circumstances involved should be undertaken. *See N.A.A.C.P. v. Bennett*, 360 U.S. 471, 79 S.Ct. 1192, 3 L.Ed.2d 1375 (1959). The Supreme Court has stated:

"Abstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.' *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–189 [, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163, 1166] (1959)."

*Colorado River Water Const. Dist. v. United States, supra*, 424 U.S. at 815, 96 S.Ct. at 1244. The benefits of abstention must be weighed against the delay and expense which is an inevitable by-product. *See Bellotti v. Baird, supra; Harris County Comm'rs. Court v. Moore*, 420 U.S. 77, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975); *Herald Co. v. McNeal, supra.*

The two arguments for abstention set forth above are considered below in light of these principles.

### 1. State constitutional claim

■ Whether the Court should abstain in favor of a state court determination of whether the Act violates the state constitution depends on whether the Arkansas constitutional guarantee of separation of church and state mirrors the First Amendment establishment clause. If it is unique, abstention may be proper. If it is similar, abstention would be improper. *See Examining Bd. of Engineers v. Flores de Otero, supra; Herald Co. v. McNeal, supra.* As the Court stated in *Examining Bd. of Engineers*, to require a plaintiff to first seek relief under a state constitutional provision mirroring those in the federal constitution "would convert abstention from an exception into a general rule." 426 U.S. at 598, 96 S.Ct. at 2279.

Article 2, § 24 of the Arkansas Constitution provides:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect or support any place of worship; or to maintain any ministry against his consent. No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship above any other."

The language employed is substantially different from the establishment clause, which merely provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." However, we have found no Arkansas cases holding the state provision to be more restrictive than its federal counterpart. Moreover, the language used does not necessarily suggest that the state provision was intended to be more restrictive than the First Amendment. Nevertheless, it is a close question whether the state provision might be viewed as more restrictive. Therefore, we must turn to a consideration of the delay and expense which would occur should we decide to abstain. First, how-ever, we will review the effect of the two possible interpretations of the Scholarship Program Act on the constitutional issue.

### 2. Posture of constitutional issue

As noted above, the fact that the Act is susceptible of at least two different interpretations, each of which would cast the question of its constitutionality in a different light, provides a permissible basis for abstention. In favor of abstention, it can be argued that declining to abstain would require this Court to either authoritatively interpret the Act without guidance from the state courts, or run the risk of unnecessarily deciding a constitutional question. (As to the latter suggestion, the Court might decide the constitutionality of the Act as *applied* without necessarily adopting an authoritative interpretation. Later state court proceedings, however, could result in a different interpretation and thus render the Court's constitutional analysis nugatory.)

■ A number of arguments can also be mustered against abstention and, in the opinion of the Court, they preponderate. First, regardless of whether defendant Cook's interpretation of the Act is the one that the Arkansas courts would adopt, it is at least one of which the Act is susceptible. Therefore, plaintiff's complaint *does not require* the Court to adopt an authoritative interpretation of the Act. Plaintiff's complaint seeks only a declaration that the Act is unconstitutional on its face, and an injunction against the expenditure of state funds thereunder which would flow to private religious schools. A ruling that the Act, *as presently applied*, is constitutional would, therefore, dispose of all of plaintiff's claims.

Second, it can be argued—the Court concludes, correctly—that the Court need not reach defendant-intervenors' claim that their interpretation of the Act is the proper one (and that the Act is nonetheless constitutional). Intervenors' claim is raised only as an abstract legal argument and not in connection with any prayer for relief. Moreover, defendant-intervenors would ap-

pear to lack standing to assert a claim that defendant Cook is improperly denying the benefits of the Act to certain schools through an erroneous interpretation of it. Seven of the eight intervenors attend schools which have been approved. Deborah Moore, the eighth, had her scholarship revoked due to the deferral of approval of John Brown University. However, Miss Moore is no longer a freshman; John Brown University has now been approved; and Miss Moore asserts no claim for retroactive reinstatement of her scholarship.

Third, this action has been pending since September, 1975, and the parties have invested considerable time, effort, and, presumably, money into it. Abstention would cause further delay and expense. Finally, none of the parties has requested that the Court abstain, and it is not clear that any of them would be willing to institute, and carry through with, appropriate state proceedings. Moreover, the only party philosophically attuned to presenting the argument (to the state courts) that defendant has construed the Act too narrowly may have a standing problem.

In sum, although the question is a close one, we conclude that we should not abstain. If the issue had been raised, or noted, at an early stage in this proceeding, we probably would have reached a contrary conclusion. We do, however, limit our holding on the merits to the constitutionality of the Act *as applied by the defendant Cook*, without sanctioning that interpretation as necessarily the most appropriate one. This approach will not foreclose, or in any way inhibit, subsequent state proceedings to determine the proper interpretation of the Act, and a constitutional challenge should a different interpretation be adopted.

*The Merits*

In light of the discussion above, the analysis of the merits will focus on the Act as applied by defendant Cook.

■ The Supreme Court has struck down a variety of aid to religious school programs and upheld others. *See Roemer v. Maryland Public Wks. Bd.*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (plurality opinion), and cases discussed therein. It has not considered a program precisely like the one involved here.[1] From these cases, however, has emerged a three-part test for determining whether statutes affording aid to church related schools are violative of the establishment clause. First, the statute must have a secular legislative purpose. Second, its primary effect must be one that neither advances nor inhibits religion. Finally, the statute must not foster excessive government entanglement with religion. *See, e. g., Roemer v. Maryland Public Wks. Bd., supra; Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

■ Defendant-intervenors contend that these tests are inapplicable here and the Court should simply sustain the Act without looking to them since the Act provides for aid to students, not schools. They rely on three cases in which such an approach was taken: *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); and *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). *Meek* and *Allen* involved textbook loan programs. *Everson* involved transportation assistance. We

1. Note, however, that in *Committee for Public Ed. v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Court alluded to the constitutional issue raised by defendant-intervenors' interpretation of the Act but left it unresolved. *Id.* at 782, n. 38, 93 S.Ct. at 2970. " . . . [W]e need not decide whether the *significantly religious character* of the statute's beneficiaries might differentiate the present cases from a case involving some form of public assistance (*e. g.*, scholarships) made available generally without regard to

the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited. See *Wolman v. Essex*, 342 F.Supp. 399, 412–413 (SD Ohio), aff'd, 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972). Thus, our decision today does not compel, as appellees have contended, the conclusion that the educational assistance provisions of the 'G.I. Bill,' 38 U.S.C. § 1651, impermissibly advance religion in violation of the Establishment Clause. See also n. 32, *supra*."

conclude that the approach urged by defendant-intervenors should be rejected. First, while the Act provides aid directly to students and does not require that it be spent for tuition, it is clear that some of the aid is passed on to schools in the form of tuition and fees. Second, the Supreme Court has not drawn the sharp distinction between student-aid and school-aid programs urged by defendant-intervenors. In *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Court stated at 781, 93 S.Ct. at 2969:

" . . . The State and intervenor-appellees rely on *Everson* and *Allen* for their claim that grants to parents, unlike grants to institutions, respect the 'wall of separation' required by the Constitution. It is true that in those cases the Court upheld laws that provided benefits to children attending religious schools and to their parents: As noted above, in *Everson* parents were reimbursed for bus fares paid to send children to parochial schools, and in *Allen* textbooks were loaned directly to the children. But those decisions make clear that, far from providing a *per se* immunity from examination of the substance of the State's program, the fact that aid is disbursed to parents rather than to the schools is only one among many factors to be considered."

The Court, in *Nyquist*, went on to analyze a tuition reimbursement plan under the three-part test. Finally, a three-judge district court has applied the test to a case similar to this one. *Americans United v. Bubb, supra.* Accordingly the Act will be analyzed under the more restrictive three-part test.

### 1. *Secular purpose*

The Act clearly has a secular purpose. The statement of purpose in § 80–3374 evinces a reasonable secular purpose, and there is nothing in the record to indicate that the Act is a subterfuge for something else.

### 2. *Primary effect*

The Supreme Court has defined aid having a primary effect of advancing religion as follows:

"Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting."

*Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). In *Roemer, supra*, 426 U.S. at 755, 96 S.Ct. at 2349, the Court stated, with respect to primary effect:

"*Hunt* requires (1) that no state aid at all go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones, and (2) that if secular activities *can* be separated out, they alone may be funded."

■ Here, the first question, then, is whether the Arkansas private colleges which are approved, and are, therefore, in a position to derive benefit from the scholarship program, are so pervasively sectarian that secular and sectarian activities cannot be separated. The Supreme Court has not adopted specified standards for applying these tests; however, the district court in *Americans United v. Bubb, supra*, set forth eight criteria to be considered. See above. These criteria are drawn from, or comport with, various factors focused upon in a number of Supreme Court decisions. *See Roemer, supra; Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 79 (1971). In general, the Supreme Court has held to be not pervasively sectarian "institutions with admittedly religious functions but whose predominant higher education mission is to provide their students with a secular education." *Roemer, supra*, at 758–59, n. 21; *Tilton v. Richardson, supra*, 403 U.S. at 686–87, 91 S.Ct. at 2099.

Evidence concerning the nature of the Arkansas private schools is set forth in the transcript of the evidentiary hearing, the offers of proof of the defendant-intervenors, and the Minutes of the Board of Higher Education's meetings of October 3, 1975, and July 9, 1976. (Defendant's exhibits 3 and 6.) That evidence, essentially noncontroverted, clearly shows, and the Court so finds, that none of the approved schools is pervasively sectarian.

■ The next question is whether the use of state funds can be restricted to secular activities at the approved colleges. The Court finds that they can. First, as noted above, all of the private college presidents represented to the Board of Higher Education that they could and would do so. Second, the Supreme Court has indicated that it may be difficult to separate secular and sectarian activities at parochial elementary and secondary schools where the students are at an impressionable age and religious indoctrination is an important institutional aim, but that the same cannot be said of colleges, since students there are less impressionable and the opportunities for indoctrination more limited. *Compare Tilton v. Richardson, supra, with Lemon v. Kurtzman, supra.* Finally, the fact that the religious aspects of the colleges may in some manner benefit from the scholarship program does not alone serve to invalidate the Act. In *Hunt v. McNair, supra,* the Court stated, 413 U.S. at 743, 93 S.Ct. at 2874:

" . . . [T]he Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends."

In *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 775, 93 S.Ct. at 2967, the Court stated:

"But an indirect and incidental effect beneficial to religious institutions has never been thought a sufficient defect to warrant the invalidation of a state law."

*See also, generally, Roemer, supra.*

The above discussion has focused upon whether the Act advances religion. Defendant-intervenors raise an interesting argument that the Act, as presently applied, inhibits religion. They contend that limiting approved schools to those which are not overly permeated by religion encourages schools to sacrifice their religious ideals in order to qualify. This argument has drawn support from Mr. Justice Stevens in his dissenting opinion in *Roemer, supra,* 426 U.S. at 775, 96 S.Ct. at 2358:

"My views are substantially those expressed by Mr. Justice Brennan. However, I would add emphasis to the pernicious tendency of a state subsidy to tempt religious schools to compromise their religious mission without wholly abandoning it. The disease of entanglement may infect a law discouraging wholesome religious activity as well as a law encouraging the propagation of a given faith."

That argument has been implicitly rejected, however, by the majority of the Court. *See Roemer, supra,* (and cases discussed there).

### 3. Excessive entanglement

The third part of the test requires an evaluation of the degree to which the Act necessitates an entanglement between the state and religiously oriented schools. "The objective is to prevent, as far as possible, the intrusion of either into the precincts of the other." *Lemon v. Kurtzman, supra,* 403 U.S. at 614, 91 S.Ct. at 2112.

The primary inquiry is whether effectuation of the state program will require such close surveillance of religious institutions that the state will become unduly entangled with them. The relevant factors here are the administrative requirements of the Act, the character of the institutions, and the degree of sectarianism of the schools. The relevance of the latter factor is that as sectarianism increases, the degree of surveillance necessary to insure that state funds are put only to secular use also increases. *See Roemer, supra; Meek v. Pittenger, supra; Committee for Public Education v. Nyquist, supra; Hunt v. McNair, supra; Tilton v. Richardson, supra.*

Here, the Act requires the Department of Higher Education to scrutinize the operations of the colleges for purposes of deter-

mining whether they should be approved. Also, some type of ongoing monitoring will be needed in this regard. In fact, approved institutions are required to enter into a contract with the state which calls for the schools to provide various information to the state pertaining to institutional eligibility, student refund policies, educational costs, and student scholarship recipients. (Defendant's exhibit 8.) It is evident, then, that the Act requires substantial scrutiny of religious institutions. The degree of resulting entanglement, however, is diminished by the fact that the institutions are colleges rather than elementary or secondary schools, and none of the approved schools is pervasively sectarian. In *Roemer*, the Court held that a relationship between the state and church-related schools, which was very similar to that involved here, did not constitute excessive entanglement. The Court states:

> "They and the other contacts between the Council and the colleges are not likely to be any more entangling than the inspections and audits incident to the normal process of the colleges' accreditation by the State."

426 U.S. at 764, 96 S.Ct. at 2353. The Court reaches the same conclusion here.

Another excessive entanglement question is presented by the fact that the Act will require periodic appropriations by the legislature. The Supreme Court has stated that where a program which aids sectarian schools requires annual appropriations, the potential for recurring political divisiveness along religious lines arises, and this is a factor to be considered in evaluating the excessive entanglement issue. *See Roemer, supra; Meek v. Pittenger, supra; Committee for Public Education v. Nyquist, supra; Lemon v. Kurtzman, supra.* We conclude, nevertheless, that the Arkansas Scholarship Program should not fall for that reason. The potential for political divisiveness is lessened here by the fact that the aided institutions are colleges, and the Act provides aid to students attending public and private colleges alike. *See Roemer, supra.*

*Conclusion*

The Court concludes that the Act, as applied, is constitutional, and that plaintiff's complaint and intervenors' intervention should be dismissed.