The Honorable Ed Wilkinson State Senator P.O. Box 610 Greenwood, AR 72936-0610
Dear Senator Wilkinson:
You have requested an Attorney General opinion concerning Rule 8 of the Department of Higher Education's Rules and Regulations for Institutional and Program Certification in Arkansas.
More specifically, you have asked:
 Is Rule 8(I) of the Arkansas Department of Higher Education's Rules and Regulations a violation of the First Amendment to the United States Constitution and the right of religious freedom under Article 2, Sections 24 or 25 of the Arkansas Constitution?
RESPONSE
Summary of Opinion
It is my opinion that Rule 8(I) does not on its face violate the Free Exercise Clause of the First Amendment to the U.S. Constitution, but that the Rule does on its face raise a constitutional concern about the Establishment Clause. My conclusions are the same with regard to Sections 24 and 25 of the Arkansas Constitution, respectively. It is my opinion further that as to all of these constitutional provisions, factual evidence about the way in which Rule 8(I) is applied could conceivably be adduced to counter-balance these initial conclusions.
Preliminary Matters
Before embarking upon a discussion of your specific constitutional concerns, I must note that legislative acts are presumed to be constitutional, and if the courts can interpret legislation so as to uphold its constitutionality, they will do so. Barclay v. First ParisHolding Co., 344 Ark. 711, 42 S.W.3d 496 (2001). I believe that the courts would apply this presumption of constitutionality to rules and regulations promulgated pursuant to legislatively-granted authority. Accordingly, I will follow this principle in addressing the constitutional issues you have raised about Rule 8.
I also note that I can address the constitutional issues only to the extent that your question refers to the face of Rule 8(I). I cannot opine as to the legality of the rule as it may be applied. That is, the rule could conceivably be applied in a host of fact situations that could give rise to claims of illegality. Because of the myriad of possible factual scenarios, I cannot opine generally as to the legality of theapplication of the rule. However, I will discuss the constitutionality of its language.
DISCUSSION
Description of the Certification Program
The Rules and Regulations for Institutional and Program Certification arise out of the requirements of A.C.A. § 6-61-301. That statute requires that individuals desiring to establish post-secondary institutions in the State of Arkansas (other than those regulated under A.C.A. § 6-51-501 etseq. and A.C.A. § 6-51-605 et seq.), and post-secondary institutions desiring to offer programs leading to a degree customarily granted by colleges or universities in the academic marketplace, incorporate under Arkansas law, and be certified by the state to offer such programs. Out-of-state institutions operating in Arkansas must also obtain certification. Certification can be granted to an institution generally, or to an institution for specific degree programs offered by the institution. The statute authorizes the Department of Higher Education to establish the criteria that are to be required for certification and to promulgate rules and regulations for the implementation of these requirements. A.C.A. § 6-61-301(b).
Under the Department's rules and regulations, individuals and institutions who are subject to the certification requirement must provide extensive information to the Department concerning a variety of matters about the institution, such as its program, the qualifications of its faculty to support the program, the suitability of its facilities to its program, and its funding and financial status. These institutions are also subject to periodic review by the Department, and can have their certification revoked if they fail to meet the Department's standards. Any person who, without certification, offers college degree programs that are customarily offered in the academic marketplace will be in violation of the certification statute. Such violation constitutes a misdemeanor and is punishable by a fine of $1000.00 or three months in the county jail.
The purpose of the certification requirement appears to have been to protect the public to whom the programs of post-secondary institutions are offered. In particular, the certification requirement appears to be aimed at protecting consumers from being misled as to the transferability of the credit hours they receive and as to the validity of the degrees that they receive.
The Department's rules and regulations do not offer an exemption for most non-religious institutions whose degree programs are not the same as those customarily offered in the academic marketplace.[1] If the Department determines that the title and content of a non-religious institution's degree programs are not the same as those customarily offered by colleges and universities in the academic marketplace, the institution is not required to obtain certification, but is not granted official "exempt" status. Such institutions must, instead, obtain a license (for a fee) from the state Board of Private Career Education, pursuant to A.C.A. § 6-51-601 et seq.
Rule 8 of the Department's rules and regulations does, however, create a specific exemption for religious programs in certain instances. It states in pertinent part:
I. Religious Programs
 A. Any institution desiring to offer both religious programs and college-credit courses or degree programs recognized in the academic marketplace must obtain Arkansas Higher Education Coordinating Board certification.
 B. The Arkansas Higher Education Coordinating Board does not require certification under the following conditions:
 1. The predominant purposes of the courses and programs are religious in nature, transmit the theology of the religious group, and train individuals to perform the religious functions of the group.
 2. The limited purposes of the courses or degree programs are clearly identified so that both the recipients of the training and others evaluating the training are notified that the courses and programs are not designed for use in the academic marketplace.
 C. Any degree title approved by the Arkansas Higher Education Coordinating Board may not be used by institutions desiring an exemption under Rule 8, Section I.
 D. The title of university may not be used by an institution desiring an exemption under Rule 8, Section 1.
Department of Higher Education's Rules and Regulations for Institutionaland Program Certification in Arkansas, Rule 8(I).
In order to obtain the religious exemption under Rule 8(I), an institution must submit information to the Department that establishes that the degree programs being offered are, in fact, religious in nature, and are not the same as those customarily offered in the academic marketplace. An institution that is granted official "exempt" status can offer its religious, post-secondary programs without certification, and without regulation by other state boards or agencies (such as the Board of Private Career Education).
THE FIRST AMENDMENT CONCERNS
It is not clear whether your First Amendment concern with the above-quoted regulation arises out of the Free Exercise Clause of theFirst Amendment, or out of the Establishment Clause of theFirst Amendment. I will therefore discuss both clauses.
1. The Free Exercise Concern
Your First Amendment concern with Rule 8(I) may arise out of the Free Exercise Clause of the First Amendment, which states:
 Congress shall make no law . . . prohibiting the free exercise [of religion].
U.S. Const., Am. 1.
The prohibitions of the First Amendment are made applicable to the states through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296,303 (1940).
The Free Exercise claim about Rule 8(I) presumably would be that requiring religious organizations to obtain certification if they offer both religious courses and college degrees that are recognized in the academic marketplace places a burden on such organizations' free exercise of their religion.
It is my opinion that a claim of this nature does not arise on the face of Rule 8(I) and indeed, would be difficult to support. The United States Supreme Court has held that neutral, generally applicable laws that are clearly constitutional when applied to non-religious entities, and that do not single out religion for a burden, do not violate the Free Exercise Clause. See Employment Div., Ore. Dept. Of Human Res. v. Smith,494 U.S. 872 (1990). In Smith, two employees of a drug rehabilitation organization were fired from their jobs for ingesting peyote as a part of a Native American religious ceremony, which violated the State of Oregon's controlled substance law. The state denied them unemployment benefits because they had been fired for misconduct. They argued that the state had violated their Free Exercise rights under the First Amendment by criminalizing conduct that was required by their religion, and by therefore denying them unemployment benefits. The Court rejected this argument, stating:
 We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. As described succinctly by Justice Frankfurter in Minersville School Dist. Bd. Of Ed. v. Gobitis, 310 U.S. 586, 594-595
(1940): "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities (footnote omitted)."
Smith, 494 U.S. at 878.
The Court also stated:
 Subsequent decisions have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." United States v. Lee, 455 U.S. 252, 263, n. 3 (1982) (STEVENS, J., concurring in judgment).
Smith, 494 U.S. at 879. The Court further pointed out that the only cases in which it had held that the Free Exercise Clause bars the application of neutral, generally applicable laws to religious action were those involving not only the Free Exercise claim, but also some other constitutional claim, such as freedom of speech. The Court has since reiterated this principle. See City of Boerne v. Flores, 521 U.S. 507
(1997). It has noted the principle even in cases in which it found a Free Exercise violation. For example, in Church of Lukumi Babalu Aye, Inc. v.Hialeah, 508 U.S. 520 (1993), the Court invalidated certain city ordinances that prohibited animal sacrifices, because it found that the ordinances violated the Free Exercise Clause. The Court explicitly reiterated the test articulated in Smith, but found that the Smith
standard was inapplicable because the ordinances in question were not neutral and generally applicable because they singled out religion for the burden imposed.
The two respondents in Smith also argued that the state should have been required to establish a compelling governmental interest as a basis for its criminal prohibition of their religious practice. More specifically, they argued that the courts should have employed the test articulated inSherbert v. Verner, 374 U.S. 398 (1963), under which the court must consider whether the law in question substantially burdens a religious practice and, if so, whether the burden is justified by a compelling government interest. The Court rejected this argument, holding that theSherbert test is appropriate only in cases involving a state system of assessing relevant individual personal conduct (such as a system of unemployment benefits). The compelling governmental interest test ofSherbert is inappropriate in cases involving a law that applies across the board to the conduct in question (such as conduct that is prohibited by a criminal statute). Id. at 881-882; City of Boerne v. Flores,521 U.S. 507 (1997).) Thus, if a law is neutral and generally applicable, the state need not establish a compelling interest in order for it to be upheld — even if it does create an incidental burden on religion. "Not all burdens on religion are unconstitutional." United States v. Lee,455 U.S. 252, 257 (1982) (upholding the imposition of Social Security taxes on an Amish employer, even though the Court acknowledged that the payment of such taxes did violate his religious tenets), citing Prince v.Massachusetts, 321 U.S. 158 (1944); Reynolds v. United States,98 U.S. 145 (1879).
On the basis of these precedents, I conclude that the Department of Higher Education's Rule 8(I) does not present a Free Exercise problem on its face. It is neutral and generally applicable. The certification requirement applies to all institutions that offer degree programs recognized in the academic marketplace. The Supreme Court's decisions indicate that under these circumstances, the rule will likely survive a Free Exercise challenge. Such a challenge might have a chance of succeeding if facts could be adduced to show that, as applied, the certification requirement burdened not only the complainant's religion, but also other constitutional rights, and that the state has no compelling interest in the certification requirement.
2. The Establishment Clause Concern
Your First Amendment concern with Rule 8(I) may arise out of the Establishment Clause, which states:
Congress shall make no law respecting an establishment of religion[.]
U.S. Const., Am. 1. As stated previously, the prohibitions of theFirst Amendment are made applicable to the states through theFourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).
The claim of unlawful establishment presumably would be that because Rule 8 allows an exemption from the certification requirements to religious organizations that is not available to non-religious organizations, it constitutes a "law respecting an establishment of religion," as that phrase has been interpreted by the U.S. Supreme Court.
It is my opinion that the face of Rule 8(I) may provide a basis for such a claim. (However, as previously noted, the facts presented in connection with the claim could conceivably counter-balance the foregoing conclusion.)
Claims made under the Establishment Clause must be analyzed using the test set forth by the U.S. Supreme Court in Lemon v. Kurtzman,403 U.S. 602 (1971). The Lemon Court held that in order to avoid offending the Establishment Clause, the government action in question must: (1) have a secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) not foster an excessive entanglement with religion. Id. at 612-13.[2]
In my opinion, the cases that are most closely analogous and most helpful in analyzing the exemption allowed by Rule 8(I) are those involving exemptions (such as tax exemptions) for religious organizations from generally applicable requirements of law. The principles governing the application of the Lemon test to such exemptions have been most clearly explicated in Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989). In that case, the U.S. Supreme Court addressed a sales tax exemption granted under Texas law to religious publications. More specifically, the exemption applied to "[p]eriodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teachings of the faith and books that consist wholly of writings sacred to a religious faith." Tex. Tax Code Ann. § 151.312 (1982). Texas Monthly, a non-religious magazine to which the exemption was not available, paid the tax under protest, and sued for a refund. The lower court ordered the refund, ruling that the exemption promoted religion in violation of the Establishment Clause. The state court of appeals reversed. The U.S. Supreme Court in turn reversed the holding of the state court of appeals, holding that the exemption did violate the Establishment Clause. The primary basis for the Court's holding was the narrow scope of the exemption (it applied only to religious organizations), and the absence of any factual evidence to show a burden on religion.
Regarding the scope of the exemption, the Court distinguished the case from Walz v. Tax Comm'n of New York City, 397 U.S. 664 (1970), in which it had sustained a property tax exemption that applied to religious organizations, on the grounds that the exemption in Walz was available to a wide range of organizations, and not just to religious organizations. That is, the exemption that was at issue in Walz did not apply only to religious organizations. In contrast, the exemption that was at issue inTexas Monthly was specifically limited to religious organizations. This factor was what was fatal to the exemption, because, in the absence of any evidence to show a burden on religion, the singling out of religion for the benefit indicated that the exemption failed the "secular purpose and effect" parts of the Lemon test.
Discussing this distinguishing feature, the Court stated:
 [W]e emphasized in Walz that in granting a property tax deduction, the State "has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups." 397 U.S., at 673. The breadth of New York's property tax exemption was essential to our holding that it was "not aimed at establishing, sponsoring, or supporting religion," id., at 674, but rather possessed the legitimate secular purpose and effect of contributing to the community's moral and intellectual diversity and encouraging private groups to undertake projects that advanced the community's well-being and that would otherwise have to be funded by tax revenues or left undone. Moreover, "[t]he scheme [was] not designed to inject any religious activity into a nonreligious context, as was the case with school prayers. No particular activity of a religious organization — for example, the propagation of its beliefs — [was] specially promoted by the exemptions." Id., at 689 (BRENNAN, J., concurring).
Texas Monthly, 489 U.S. at 12.
In discussing Walz and other cases in which the Court had sustained legislation that resulted in benefits to religious organizations, the Court pointed out:
 In all of these cases . . ., we emphasized that the benefits derived by religious organizations flowed to a large number of nonreligious groups as well. Indeed, were those benefits confined to religious organizations, they could not have appeared other than as state sponsorship of religion; if that were so, we would not have hesitated to strike them down for lacking a secular purpose and effect. See, e.g., School Dist. of Grand Rapids v. Ball, [473 U.S. 373, 381 (1985)] (invalidating state-funded educational programs in private schools, where 40 of the 41 beneficiaries were religious schools); Estate of Thornton v. Caldor, Inc., 472 U.S. 703 (1985) (finding violative of the Establishment Clause a statute providing Sabbath observers with an unconditional right not to work on their chosen Sabbath).
Texas Monthly, 489 U.S. at 9.
The Court also discussed Widmar v. Vincent, 454 U.S. 263 (1981), in which it had held that a state university that makes its facilities available to registered student groups may not deny equal access to a registered student group desiring to use those facilities for religious worship or discussion. The Court pointed out that in Widmar, it had noted that
 an open forum in a public university would not betray state approval of religion so long as the forum was available" to a broad class of nonreligious as well as religious speakers." 454 U.S., at 274. "The provision of benefits to so broad a spectrum of groups," we said, "is an important index of secular effect." Ibid. We concluded that the primary effect of an open forum would not be to advance religion, "[a]t least in the absence of empirical evidence that religious groups will dominate" it. Id., at 275.
Texas Monthly, 489 U.S. at 11 (emphasis added).
Because the exemption that was at issue in Texas Monthly had a much more limited scope, applying specifically to religious organizations only (and because there was no evidence of a burden on religion), the Court concluded that it had the purpose and effect of advancing religion, thus failing the Lemon test, and violating the Establishment Clause.
Before applying the analysis of Texas Monthly to Rule 8(I), I must distinguish a case involving similar principles, but in which the Court reached a contrary result. In Corporation of Presiding Bishop v. Amos,483 U.S. 327 (1987), the Court addressed a case in which the plaintiff was an employee of a facility operated by the Church of Jesus Christ of Latter Day Saints, holding a secular position (building engineer). He was dismissed from his job because he failed to qualify for a certificate showing that he was a member of the church and eligible to attend its temples. He (representing a class of plaintiffs) sued, alleging violation of the Civil Rights Act. The defendants moved to dismiss the suit, relying on an exemption in the Act for religious organizations. The District Court denied the motion, finding that because the exemption extended to religious organizations' secular activities, it violated the Establishment Clause. The U.S. Supreme Court reversed the District Court's decision, finding that the exemption was necessary to avoid placing an unacceptable burden on religion.
In reaching its decision, the Court noted that the District Court had relied heavily on the fact that the exemption in question singled out religious entities for the benefit. The U.S. Supreme Court found that this reliance was misplaced. This aspect of the Court's opinion may appear, at first blush, to conflict with the Texas Monthly opinion. Given the Court's own heavy reliance on this factor in Texas Monthly, it is necessary to harmonize the two cases.
The primary factor that explains the difference in the Court's treatment of this factor in these two cases, and the factor that makes the two cases compatible despite this difference, has to do with the difference in the particular burden on religion that was apparent from the face of the regulations under consideration in the two cases. In Amos, it was apparent from the face of the Civil Rights Act that without the exemption a significant burden would have been placed on the religious organization involved. In Texas Monthly, by contrast, no such burden was apparent from the face of the sales tax laws under consideration.
The Amos Court specifically noted that the singling out of religion for a benefit can be a significant factor to be considered, see Amos,483 U.S. at 338, but that where the benefit is granted for the purpose of removing a burden on free exercise, it need not be granted to non-religious groups as well. In Amos, it was apparent from the face of the Civil Rights Act that not applying the exemption to the secular aspects of the religious organization's functions would create a significant burden on the organization's ability to carry out its religious tenets, because it would place the organization in the position of having to predict which of its functions a court would determine to be religious and which a court would determine were not religious. (This factor, the Court noted could also create more entanglement than not granting the exemption.)
This issue concerning the facial burden on religion was the distinguishing factor in Texas Monthly, and indeed, was central to the Court's decision in Texas Monthly. The Texas Monthly Court held that there was nothing to indicate that not granting the exemption would create any burden on religious organizations' free exercise, and indeed, no factual evidence had been presented to show such a burden. Under those factual circumstances, the fact that the exemption benefit was grantedonly to religious organizations became more significant.
The Texas Monthly Court explained:
 [W]hen government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion, as Texas has done, . . . it "provide[s] unjustifiable awards of assistance to religious organizations" and cannot but "conve[y] a message of endorsement" to slighted members of the community. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 348 (1987) (O'CONNOR, J., concurring in judgment). This is particularly true where, as here, the subsidy is targeted at writings that promulgate the teachings of religious faiths.
Texas Monthly, 489 U.S. at 15 (emphasis added).
It is clear, then, that singling out religious organizations for a benefit is more problematic in situations in which it is not apparent from the face of a regulation that the exemption granted to religious organizations is necessary to avoid a significant burden on religion, or to avoid a violation of the Free Exercise Clause.
Regarding this factual issue, it should be noted that the U.S. Supreme Court has stated that in the absence of any indication of such a burden, it cannot be assumed that the Free Exercise Clause requires the grant of an exemption from generally-applicable requirements. "It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." Tony and Susan Alamo Foundation v. Secretary of Labor,471 U.S. 290, 303 (1985) (emphasis added).
When all of the foregoing principles are applied to the exemption from certification that is granted in the Department of Higher Education's Rule 8(I), a legitimate question is raised, in my opinion, concerning the scope of the exemption. There is nothing on the face of the Department's rules governing institutional certification to indicate that imposing these rules on religious organizations would create a burden on religion. Moreover, on its face, the exemption in Rule 8(I) appears to apply specifically and only to religious organizations.[3] Indeed, in order to be eligible for the exemption under Rule 8(I), an organization must be able to demonstrate that "the predominant purposes of the courses and programs are religious in nature, transmit the theology of the religious group, and train individuals to perform the religious functions of the group." The exemption gives religious organizations a benefit that similarly-situated non-religious organizations cannot receive: religious organizations can offer post-secondary degree programs without certification by the Department of Higher Education, and without licensure by the Board of Private Career Education. But non-religious institutions that offer post-secondary degree programs must either be certified by the Department, or be licensed by the Board (for a fee). Under the reasoning of Texas Monthly, this factor (in the absence of factual evidence showing that the certification requirement creates a significant burden for religious organizations) could indicate that the narrow scope of the exemption has the purpose and effect of advancing religion — at least on the face of the exemption.
For this reason, I conclude that there might be an adequate basis on the face of Rule 8(I) for a challenge to the Rule on the grounds that it violates the Establishment Clause. I reiterate that if factual evidence could be produced to establish that certification significantly burdens religious institutions, the narrow scope of the exemption will be less important. But again, this is information that does not appear on the face of the rules.
I must point out a further Establishment Clause concern with Rule 8(I) that arises out of the particular structure of the certification program. More specifically, the exemption, under the current structure of the program, could be argued to foster an excessive entanglement of religion, which would constitute a violation of the Establishment Clause under the third prong of the Lemon test. The entanglement problem arises as follows: As the program is currently structured, an institution that wishes to obtain the religious exemption must submit information to establish that it is, in fact, a religious organization. The Department of Higher Education, in order to grant the exemption, must determine whether the institution constitutes a "religious" organization. This is a determination that is clearly outside the purview of the state. Thomasv. Review Bd., Ind. Empl. Sec. Div., 450 U.S. 707 (1981). Indeed, the U.S. Supreme Court pointedly eschewed such determinations by the state inSmith, supra. Regarding this issue, the Court stated:
What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is "central" to his personal faith? Judging the centrality of different religious practices is akin to the unacceptable "business of evaluating the relative merits of differing religious claims." United States v. Lee, 455 U.S., at 263 n. 2 (STEVENS, J., concurring).
Smith, 494 U.S. at 887.
For the state to be involved in making pronouncements as to what does and does not constitute a religion not only places the state at risk of unconstitutionally burdening some religious organizations, but also places the state at risk of excessive entanglement with religion. The Court has recently stated: "It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." Mitchell v. Helms, 530 U.S. 793
(2000).
For all of the foregoing reasons, I conclude that the religious exemption of Rule 8(I) may present, on its face, a basis for an Establishment Clause claim. As noted, however, such a claim could be overcome by the presentation of factual evidence that not providing the exemption would create a significant burden on religion.
I must note that the U.S. Supreme Court has not addressed an exemption precisely like the one that is granted in Rule 8(I), and it is not entirely clear that it would treat such an exemption as it treated the tax exemption in Texas Monthly (although it would be reasonable, in my opinion, for the Court to apply the same reasoning). I also reiterate that Rule 8(I) will be presumed to be constitutional, and if a court considering the challenge can find a way to uphold the rule, it will do so. I therefore express no opinion as to the likelihood of success of any constitutional challenge to Rule 8(I); rather, I simply note the possibility of such a challenge.
The Arkansas Constitution
It is my opinion that the analysis of whether Rule 8(I) violates Article2, §§ 24 and 25 of the Arkansas Constitution should parallel the above analysis under the two religion clauses of the First Amendment to the U.S. Constitution.
The religion clauses of the Arkansas Constitution state:
24. Religious liberty.
 All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect or support any place of worship; or to maintain any ministry against his consent. No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given, by law, to any religious establishment, denomination or mode of worship above any other.
25. Protection of religion.
 Religion, morality and knowledge being essential to good government, the General Assembly shall enact suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship.
Ark. Const., Art. 2, §§ 24 and 25.
Although the above-quoted religion clauses from the Arkansas Constitution are substantially different than the religion clauses of the U.S. Constitution, they are nevertheless generally analogous to the Establishment Clause and the Free Exercise Clause of the First Amendment to the U.S. Constitution. The analysis that the Arkansas Supreme Court has applied in interpreting these sections of the Arkansas Constitution appears likewise to be analogous to the analysis discussed above in connection with the religion clauses of the First Amendment. See, e.g.,Abram v. City of Fayetteville, 281 Ark. 63, 661 S.W.2d 371 (1983); Cudev. State, 237 Ark. 927, 377 S.W.2d 816 (1964). Moreover, there has been no indication in any court opinion that these sections of the Arkansas Constitution are more restrictive than the religion clauses of the U.S. Constitution. See Lendall v. Cook, 432 F. Supp. 971, 976 (E.D.Ark. 1977); Cortez v. Independence County, 287 Ark. 279, 698 S.W.2d 291
(1985). I therefore find that it is not necessary to conduct a separate analysis of Rule 8(I) under these sections of the Arkansas Constitution.
A Possible Approach to Avoiding First Amendment Claims
A question may arise as to how Rule 8(I) should be handled so as to avoid possible First Amendment problems. As the U.S. Supreme Court noted inTexas Monthly, possible problems could be avoided in one of two ways: either extend the exemption to a broader range of beneficiaries, or abolish it altogether. The Department of Higher Education could extend the exemption to non-religious institutions that offer post-secondary degree programs that are not offered in the recognized academic marketplace. These institutions could be granted the same official "exempt" status that is currently offered to religious organizations. (I note that these institutions may nevertheless be subject to the regulation of the Board of Private Career Education. I do not address the constitutionality of that Board's exemption for religious organizations herein.) On the other hand, the Department could abolish the exemption altogether.[4] Under this approach, the programs of all institutions would be subject to the same scrutiny, but this scrutiny would not place the Department in the position of determining whether organizations constitute "religions," and organizations that have managed to prove their religious nature to the Department's satisfaction would not receive a special benefit that is not available to similarly-situated non-religious institutions or to institutions who claim to be religious but have not managed to prove their religious status to the Department. Either approach would enhance the Department's goal of protecting consumers.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
[1] Rule 8(II) grants an exemption for certain courses offered on military bases. That exemption does not raise First Amendment issues, nor does it impact the Establishment Clause issue discussed herinafter. For that reason, I do not address it in this opinion. See Footnote 3 and accompanying text.
[2] In Agostini v. Felton, 521 U.S. 203 (1997), the Court narrowed the Lemon test, at least for purposes of evaluating cases involving government aid, holding that the "effect" and "entanglement" prongs of the Lemon test actually comprise a single "effect" inquiry.
[3] As previously noted, Rule 8(II) provides an exemption for institutions offering college-credit courses or degrees on military bases. This is a separate exemption from the one that is available to religious organizations under Rule 8(I), and requires that the program in question meet certain other approval requirements (such as approval by the federal government). For these reasons, I do not consider it to be the same exemption as the one that is available to religious organizations under Rule 8(I), for purposes of analysis under the principles enunciated in Texas Monthly.
[4] I am aware that some accrediting organizations require proof of compliance with or exemption from state certification requirements. The Department is fully equipped to provide such proof, whether it grants exemptions or not.